*53° new*

## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name ___ELIAS___ ___OSVALDO___ _____
         (Last)              (First)              (Initial)

Prisoner Number __K-50464_____

Institutional Address _SAN QUENTIN STATE PRISON; SAN QUENTIN, CA 94974_

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

*TEH*

___OSVALDO ELIAS_____

Full Name of Petitioner

**CV 08    2798**

Case No.(To be provided by the
clerk of court)

**E-filing**

*(PR)*

vs.

___ROBERT L. AYERS JR. Warden___    PETITION FOR A WRIT OF HABEAS CORPUS
     Name of Respondent
     (Warden or jailor)

=================================================================

### Read Comments Carefully Before Filling In

Underline When and Where to File

When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

## A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.    What sentence are you challenging in this petition?  DENIAL OF PAROLE

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):  THE CALIFORNIA BOARD OF PAROLE HEARINGS

_____        _____
Court                                                                                Location

(b)    Case number, if known _____
(c)    Date and terms of sentence _____
(d)    Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes    No

Where?  SAN QUENTIN STATE PRISON; SAN QUENTIN, CA 94974
               (Name of Institution)                                      (Address)

2.    For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

P.C. 187 SECOND DEGREE MURDER _____

_____

_____

3.    Did you have any of the following?  N/A

Arraignment: Yes __ No __  Preliminary Hearing: Yes __ No __ Motion to Suppress: Yes __ No __

3

4.    How did you plead?  N/A

Guilty _____    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) _____

5    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes \_\_  No \_\_

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment  Yes \_\_      No \_\_
(b)    Preliminary hearing      Yes        No \_\_
(c)    Time of plea  Yes \_\_    No \_
(d)    Trial  Yes \_\_    No \_\_
(e)    Sentencing  Yes \_\_    No \_\_
(f)    Appeal      Yes \_\_\_\_    No
(g)    Other post-conviction proceeding    Yes \_\_      No \_\_

8.    Did you appeal your conviction?  Yes \_\_  No \_\_

(a)    If you did, to what court(s) did you appeal?

Court of Appeal    Yes \_\_    No \_\_    _____
                                          (Year)                  (Result)

Supreme Court of
California        Yes \_\_    No \_\_    _____
                                          (Year)                  (Result)

Any other court    Yes \_\_    No \_\_    _____
                                          (Year)                  (Result)

(b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                                        Yes \_\_  No \_\_

(c)    Was there an opinion?    Yes    No

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                        Yes            No

If you did, give the name of the court and the result:

_____

    9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes       No _x_

PETITIONER APPEALED THE DENIAL OF PAROLE. SEE EXHIBIT "B"

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.    N/A

I.     Name of Court _____

       Type of Proceeding _____

       Grounds raised (Be brief but specific):

       a.    _____

       b.    _____

       c.    _____

       d.    _____

       Result _____ Date of Result _____

II.    Name of Court _____

       Type of Proceeding _____

       Grounds raised (Be brief but specific):

       a.    _____

       b.    _____

       c.    _____

       d.    _____

       Result _____ Date of Result _____

III.   Name of Court _____

6

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____    Date of Result _____

     (b)   Is any petition, appeal or other post-conviction proceeding now pending in any

court?   Yes __ No __

_____

(Name and location of court)

## B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully.  Give facts to support each claim.  For example, what legal right or privilege were you denied?  What happened?  Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you need more space.  Answer the same questions for each claim.

Note: You must present ALL your claims in your first federal habeas petition.  Subsequent petitions may be dismissed without review on the merits.  28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: _SEE ATTACHED PAGES 1 - 10_____

Supporting Facts:    SEE ATTACHED PAGES

Claim Two: SEE ATTACHED PAGES 11-15

Supporting Facts: _____

Claim Three: SEE ATTACHED PAGES 16-18

CLAIM FOUR ON PAGES 19-21; CLIAM FIVE ON PAGE 22

Supporting Facts: SEE ATTACHED PAGES

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:    N/A

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

SEE ATTACHED PAGES

Do you have an attorney for this petition?    Yes __ No _X_

If you do, give the name and address of your attorney:

I REQUEST APPOIONTMENT OF COUNSEL DUE TO THE COMPLEXITIES OF THESE ISSUES/

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on __5 27-08__

Date

Signature of Petitioner

( rev. 5/96)

9

## CONTENTION

### I.

### THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S STATE AND FEDERAL DUE PROCESS WHEN IT MADE A DETERMINATION OF UNSUITABILITY WITHOUT "SOME EVIDENCE"

Petitioner, Osvaldo Elias, (Petitioner) appeared before the Board of Parole Hearings on August 7, 2007, for his 3rd hearing over all, and was denied parole for three years. The Board stated the following reasons for their denial:

1. One of the main factors that the Panel did consider really goes back tot the commitment offense, that we found that it was carried out in a very cruel manner.

2. It really was carried out in a manner that shows total disregard for human suffering and life.

3. The motive for the crime, really, had to do with gang retaliation.

4. It was very trivial in that it was really a random shooting of someone.

5. We do note that he does have an unstable social history, and this being his gang affiliation since he was 13 years of age.

6. Institutional behavior, we find that the prisoner has not sufficiently participated in beneficial self-help and that his misconduct includes one 128 counseling chrono he incurred in April 2006...

(Exhibit "A" pp. 103-105)

The Board then made several favorable finding:

1. However, the prisoner should be commended for a few things. Number one, getting his GED.

2. And also for his continuing education in taking some college-level courses, the fact that he was able to obtain his vocation in dry-cleaning and also the fact that he doesn't have any serious 115 disciplinaries.

(Exhibit "A" pp. 108-109)

The Board's decisions are governed by the California Penal Code § 3041 (a) states that the Board "shall normally set a parole release date" when a prisoner approaches their minimum parole eligibility released date. However, the California Supreme Court has held that the Board must first consider, under section 3041 (b), whether a prisoner's commitment offense and or past offenses require further delay in setting a release date because of public safety concerns. The overarching factor regarding parole is whether a prisoner still poses a threat to public safety. (In re Barker, 59 Cal. Rptr.3d 746, 760).

The California Supreme Court has also established a standard of review in parole denial cases, a "some evidence" test, based on the due process requirements of the California Constitution. The Ninth Circuit has also constructed a standard of review in such cases based on the due process clause of the U.S. Constitution. The Federal standard applied by district courts in the Ninth Circuit also use the "some evidence" language--requiring affirmance of the decision denying parole. The Ninth Circuit further adds that the Board's decision must have "some indicia of reliability." McQuillion v. Duncan, 306 F.3d 895, 904 (9th Cir. 2002).

In the instant action the Board relied primarily on the commitment offense to deny Petitioner parole. The commitment offense can be relied on to deny parole if there is "some evidence" in the record that Petitioner poses a threat to public safety. The Supreme Court in In re Rosenkrantz, 29 (2002) Cal.App.4th explained that denial of parole could be based upon the nature of the commitment offense alone, however,

2

the Rosenkrantz Court cautioned that "a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation--for example where no circumstances of the offense could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that dffense." (Id. at 661

The California Supreme Court in In re Dannenberg, (2005) 34 Cal.App.4th 1061, 1095, has provided additional explanation as to when a commitment offense alone is sufficient to deny parole. Specifically, the Dannenberg court explained when a commitment offense is "particularly egregious," when it stated: "Our discussion [in Rosenkrantz], including our use of the phrase 'particularly egregious' conveyed only that the violence vicious or viciousness of the inmate;'s crime must be more than the minimally necessary to convict him of the offense for which he is confined."

As stated above, the overarching consideration is public safety. The test is not whether there is some evidence that supports the Board's reasons's for denying parole, but whether there is some evidence that Petitioner's release poses a threat to public safety. (See In re Dannenberg, Case No. H030031 (Filed 11/16/07) Santa Clara County Superior Court) Petitioner has been found not to pose a threat to public safety by professional psychologists (See Exhibit "A" pp. 52-58). Petitioner has been a stable prisoner for many years. He has maintained family ties, with his father, mother, and siblings, as well as other relatives. Exhibit "A" pp. 59-69

Although the Board has broad discretion regarding parole suitability decisions it does not have absolute discretion.

Furthermore, when a court reviews a Board decision, "⌐i]t is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (Rosenkrantz, supra, 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104 59 P.3d 174.)

However, "the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary and capricious." (Ibid.) The Board's finding that Petitioner's release would pose an unreasonable risk to society is unsupported by any evidence in (See also, Inmates of Nebraska Penal (1979) 442 U.S. 1; Board of Pardons v. Allen (1987) 482 U.S. 369.).

The Appellate Court in In re Gray, 59 Cal.Rptr.3d 724, 741-742 (Cal.App.3d Dist. 2007), held that parole is the rule for second degree murder, not the exception. Denial of parole based on the commitment alone, violates Petitioner's State and Federal due process rights. The Court in In re Scott, (2004) stated the following:

> "⌐p]arole is the rule, rather than the exception and conviction for second degree murder does not automatically render one unsuitable. (In re Smith, (2003) 114 Cal.App.4th 343, 366, italics omitted.)

The Court then attached a caveat:

> As the Court explained, "⌐a]ll violent crime demonstrates the perpetrator's potential for posing grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. (Penal Code § 3000, subd. (b) (1).) And the Legislature has clearly expressed its intent that when murderers -- who are the great majority of inmates serving indeterminate sentences -- approach their minimum eligible parole date, the Board 'shall normally set a parole release date.'

4

(Pen.Code, §3041, subd. (a).) the Board's authority
to make an exception based on the gravity of a life
term inmate's current or past offenses should not
operate so as to swallow the rule that parole is
'normally' to be granted. Otherwise, the Board's
case-by-case rulings would destroy the proportionality
contemplated by Penal Code 3041, subdivision (a),
and also by the murder statutes, which provide
distinct term of life without possibility of parole,
25 years to life, and 15 years to life for various
degrees and kinds of murder. (Pen Code, § 190.et
seq.)" (Ramirez, at p. 570. Therefore, to demonstrate
"an exceptionally callous disregard for human
suffering" (§ 2402, subd. (c)(1)(D)), the offense in
question must have been committed in a more aggravated
or violent manner than that ordinarily shown in the
commission of second degree murder.

(Id., at 891.)

In the instant action Petitioner was convicted of second

degree murder, Petitioner's offense was not committed with more

than the necessary force to convict him of second degree

murder.

The court in In re Lee, (2006) 49 Cal.Rptr.3d 931

(Cal.App. 2 Dist. 2006) stated that Lee's offense was not

particularly egregious although he shot and injured the

intended target, and killed the intended target's wife. The Lee

court further stated "yet, against two first degree murder

charges, his argument that his conduct involved no more than

the minimum acts needed to commit his offense would strengthen.

As such, he would have a stronger, not weaker, claim to parole

on two murder charges than he would for his actual crimes of

attempted premeditated murder and murder."

California Courts, interpreting the California parole

suitability guidelines, have found decisions to deny parole

unsupported by "some evidence" in cases where the petitioner

perpetrated the killing on facts much worse than this case. In

5

each case, the petitioner acted out of emotional stress or
other reasons that were more trivial than this case.

For example, In re Cooper, 62 Cal.Rptr. 921 (Cal.App. 1
Dist. 2007) Cooper killed his wife with a sledgehammer by
hitting her in the neck five or six times at the least. She
suffered for 20 to 30 minutes before she died. Cooper then hid
the body and covered up his crime. Nonetheless, the court of
appeal found that "some evidence" consistent with the California
parole scheme did not support the decision denying suitability.
Petitioner would point out that Petitioner's offense is
comarable to Cooper's.

Petitioner would further ask this Court to compare
Petitioner's offense with first degree murderers who were found
suitable for parole.

In In re Elkins, 50 Cal.Rptr.3d 503 (Cal.App. 1 Dist.
2006) that court held that the beating of the victim with a
baseball bat in order to rob him did not constitute a
particularly egregious murder. The appellate court held:

> The robbery drew a concurrent determinate term.
> Needlessly striking a robbery victim may, of
> course, show an especially heinous, atrocious
> or cruel robbery, but does not necessarily
> show an especially brutal first-degree murder.

(In re Elkins 50, Cal.Rptr.2d at p. 518).

In In re Barker, (2007) 59 Cal.Rptr.3d 746 (Cal.App. 1
Dist. 2007) Barker was convicted of two counts of second-degree
murder and one count of first-degree murder for his role in the
killing of his friends' parents and grandfather. His friend
shot his parents and Barker shot the grandfather, after first
hitting him several times on the head with a chisel. Barker had

been incarcerated for 29 years.

In In re Lawrence, 59 Cal.Rptr.3d 537 (Cal.App.2d Dist.
2007), Lawrence was convicted of first-degree murder after
shooting her lover's wife five times, than stabbing her
multiple times with a potato peeler. The appellate court found
that the evidence did not support the parole denial finding
Lawrence's offense was 'particularly egregious.' (Although
Lawrence is under review, the Supreme Court rejected the appeal
to stay Lawrence's release) Lawrence had been incarcerated for
24 years. The instant Petitioner's commitment offense does not
automatically render him unsuitable for parole.

The Board also states that the clinical psychologist
believes further insight into the commitment offense would be
appropriate. However, the clinical psychologist did not state
the Petitioner poses a threat to public safety. The Clinical
psychologist states:

> Then we get into the risk assessment, and he uses
> three different scales, the PCL-R, which is based
> on records review and an interview, and it addresses
> any level of psychopathy, and he says it's low for
> Mr. Elias. The HCR-20, which is also based on records
> and an interview and its an assessment of risk for
> future violence. He looked at it from a historical
> perspective and said it was low. He looked  at it
> form the clinical insight perspective and said it was
> low, and the he looked at it from the risk management
> perspective and said it was low and concluded the
> propensity for future violence is in the low range.

(Exhibit "A" pp. 55-56.)

The Board's decision cannot be based on any evidence in
the record, rather, the Board's evidence must have an "indicia
of reliability that Petitioner is still a threat to public
safety. The claim that Petitioner had tumultuous relationships

7

over 15 years ago, or that Petitioner's offense was trivial
over 15 years ago does not provide evidence that Petitioner is
still a threat to public safety.

### A. The Board's Continued Reliance On The Commitment Offense Violates State and Federal Due Process.

The Board's reliance on the commitment offence to deny
parole violates Petitioner's due process rights. The Board may
rely on the commitment offense alone to deny parole, but the
proposition must be properly understood. The commitment offense
is a factor indicative of unsuitability Petitioner cannot
change. In a recent decision the Board recognized that the
"⌐e]vents and circumstances surrounding petitioner's crime are
unchanging... (I want to explain to you that no matter what
happens in your lifetime, the crime is never going to change.
**You understand that... That's always going to be there,
period... ⌐T]he crime is never going to change...**)" Sanchez
v. Kane, 444 F.,Supp.2d 1049, 1062.

Reliance on such an immutable factors as the commitment
offense and the manner in which the commitment offense was
committed, as well as other immutable factors "without regard
to or consideration of subsequent circumstances" may be unfair.
(In re Smith (2003) 114 Cal.App.4th 343, 372, 7 Cal.Rptr.3d
655), and "runs contrary to the rehabilitative goals espoused
by the prison system and could result in a due process
violation." In re Scott, 133 Cal.App 4th 573, 595, (quoting
Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 917). The Scott,
court further stated; "The commitment offense can negate
suitability only if circumstances of the crime reliably

established by the evidence in the record rationally indicate
that the offender will present an unreasonable public safety
risk if released from prison. Yet the predictive value of the
commitment offense may be very questionable after a long period
of time." (Scott, supra, at 595) (quoting Irons v. Warden of
California State Prison--Solano (E.D. Cal. 2005) 358 F.Supp.2d
936, 947, fn.2 )

The Board's reliance solely on the commitment offense at
this point, after 15 years, is no longer "some evidence" that
will rationally support a finding that the public safety
requires that he be found unsuitable for parole. Recently, the
California Court of Appeals Sixth District, in its decision, in
In re Weider, 52 Cal.Rptr.3d 147 (Cal.App. 6th Dist 2006)
quoted Weider, stating:

> The court noted that Weider "has served so much
> time that, with custody credits, he is with in the
> matrix for first degree murder... ⌈I⌉t should be
> self evident that after an inmate has served the
> equivalent of 25 years, whether his actions were
> more than the minimally necessary for a second
> degree conviction... is no longer the appropriate
> question ⌈The Board's] position, that inmates who
> were only convicted of second degree may forever
> be denied parole based on some modicum of evidence
> that their acts rose to the level of a first, without
> acknowledging that fact that they have already served
> the time for a first, should be seen as so ridiculous
> that simply to state it is to refute it.

In Irons v. Carey, (9th Cir. 2007) 479 F.3d 658 the
Ninth Circuit held that "indefinite detention based solely on
an inmate's commitment offense, regardless of the extent of his
rehabilitation, will at some point violate due process given
the liberty interest that flows from the relevant California
statutes." In Biggs v. Terhune, 334 F.32d 910, 916 (9th Cir.

9

2003) the Ninth Circuit held that a continued reliance in the future, on an unchanging factor, the circumstances of the commitment offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." The Court in <u>Rosenkrnatz v. Marshall</u>, 444 F.Supp.2d 1063 (C.D. Cal.2006), held:

> While relying upon petitioner's crime as a indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances--violates due process because petitioner's dozen parole suitability earings--violates due process because petitioner's commitment offense has become such a n unreliable predictor of his present and future dangerousness that it does not satisfy the 'some evidence' standard. After nearly 20 years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil."

(Rosenkrantz v. Marshall supra, at p. 1084.).

Our Supreme Court has noted that studies by psychiatrist have erred in predicting certain individuals as potentially violent, "thus branding as 'dangerous' many persons who are in reality totally harmless. ⌈Citation]" (People v. Burnick (1975) 14 Cal.3d 306, 327 121 Cal.Rptr. 488, 535 P.2d 352.) A review of the statistics or recidivism rate of term to life prisoners· who have been granted release is less than one percent. Petitioner is such a prisoner and therefore should be released.
//////////////
//////////////
//////////////

## CONTENTION

## II.

### THE BOARD VIOLATED PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS WHEN ITS DETERMINATION TO DENY PAROLE WAS NOT BASED ON AN INDIVIDUALIZED CONSIDERATION OF THE SPECIFIED CRITERIA

The Board's decision denying Petitioner parole violated his State and Federal Due Process when its determinationn was not based on an individualized consideration of the specified criteria, therefore making the decision arbitrary and capricious.

In addition to being denied parole primarily based on the immutable factors of the commitment offense and prior social history, the Board did not only neglect to follow the specified criteria, but went beyond the prescribed regulations and statutes to find Petitioner unsuitable for parole.

The Board pointed to unspecified factors in making its decision to deny Petitioner parole, stating:

1. Petitioner has not sufficiently participated in beneficial self-help.

2. Petitioner's misconduct includes 128 counseling chrono.

3. The parole plans did not specify particular employment.

4. Petitioner needs to demonstrate an ability to maintain gains over an extended period of time.

5. Petitioner needs time for additional programming.

(Exhibit "A" p. PP, 10'ʹ 108)

These factors stated by the Board are not unsuitability factors found in the California Code of Regulations (Cal. Reg.) Title 15 § 2402, subd. (c)(1)-(6).) which are as follows:

11

    1. The commitment offense done in an "especially
       heinous, atrocious or cruel manner";

    2. "Previous record of violence";

    3. A history of unstable or tumultuous relationships
       with others;

    4. Sadistic sexual offenses;

    5. A lengthy history of severe mental problems related
       to the offense;

    6. The prisoner has engaged in serious misconduct in
       prison or jail.

    The only two of factors found by the Board, are

immutable and can never change. The other factors stated by the

Board are not found in the Cal. Regs., Title 15, but rather are

made up by the Board. The parole suitability factors are as

follows:

    1. The absence of a juvenile record;

    2. "Reasonable stable relationships with others";

    3. Signs of remorse;

    4. A crime committed "as the result of significant
       history of violent crime";

    5. Battered woman syndrome'

    6. The lack of "any significant history of violent
       crime";

    7. The prisoners present age reduces the probability of
       recidivism;

    8. "The prisoner has made realistic plans for release or
       has developed marketable skill =that can be put to
       use upon release";

    9. The prisoner's "[i]nstitutional activities indicate an
       enhanced ability to function within the law upon
       release."

    The Board claims that Petitioner has not sufficiently

participated in beneficial self-help. However, there is no

12

record of Petitioner needing any specific programming. The
clinical psychologist stated that there was no relationship
between alcohol and drugs in the committed offense. (Exhibit
"A" p. 57) If anything Petitioner is taking self-help programs
although he does not need them. The court in In re Rodrick, 65
Cal.Rptr.3d 16, (Cal.App. 1 Dist. 2007). found that:

> In short there is no evidence to support the
> Panel's determination that Roderick's programming
> was in any way "limited" or deficient. The Panel
> did not describe -and we cannot find in the record
> - any evidence that Roderick was in need of specific
> programs or that there were programs available to
> him that he failed or refused to attend.

(In re Roderick, at p. 39)

The Board's use of Petitioner's misconduct (128
counseling chrono) was not of a serious nature, therefore cannot
be used to determine parole suitability.

The Board's claim that Petitioner's parole plans did not
specify particular employment, also is not a reason for
denial. Cal. Regs , (under the suitability factors) § 2402
subd. (d)(8) Petitioner has made realistic plans for release
and has developed  marketable skills that can be put to use upon
release.

The Board's finding that Petitioner needs to demonstrate
an ability to maintain gains over an extended period of time.
In In re Barker, 59 Cal.Rptr.2d 746 (Cal.App. 1 Dist. 2007)
that court found that "[N]or is this a valid reason for denying
parole in any event. None of the suitability factors require
that a prisoner's gains be maintained "over an extended period
of time, as the Board's decision states." Furthermore, this
does not demonstrate that Petitioner would pose an unreasonable

13

risk to public safety (See Roderick, supra at p. 39).

The Board further failed to consider the specified criteria of Petitioner's age at the time of the commitment offense. Petitioner was only sixteen at the time of the committed offense. The Court in In re Barker, supra, at p. 768 found that the Board failed to consider Barkers age (16) at time he committed the crimes. In In re Elkins, supra, 50 Cal.Rptr.3d 503 the Elkins court agreed with the finding of the federal district court in Rosenkrantz v. Marshall, (C.D. Cal. 2006) 444 F.Supp.2d 1063, that "the general unreliability of predicting violence is exacerbated in [a] case by .... petitioner's young age at the time of the offense. [and] the passage [in that case of nearly twenty years since that offense was committed...'" (Elkins supra, at p. 503). The Rosenkrantz court noted his age at the time he committed the offense (one month past 18). The Rosenkrantz, court further noted that his age "further diminished" the "reliability of the facts of crime as a predictor of his dangerousness. (Ibid). The Supreme Court observed that the "evidentiary/predictive value of the conduct of such a young person is diminished ." (Ibid) The Supreme Court observed: "Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. (see Stanford [v. Kentucky (1989) 492 U.S. 361, 395, 109 S.Ct. 2969, 106 L.Ed.2d 306.] (Brennen, J., dissenting).

The Barker Court further held that:

The reality that juveniles still struggle to define

14

> their identity means it is less supportable to
> conclude that even a heinous crime committed by a
> juvenile is evidence of irretrievably depraved
> character. From a moral standpoint it would be
> misguided to equate the failings of a minor with
> those of an adult, for a greater  possibility
> exists that a minor's character deficiencies will
> be reformed.

(In re Barker, supra at p. 768.).

Indeed '[t]he relevance of youth as a mitigating factor

derives from the fact that the signature qualities of youth are

transient; as individuals mature, the impetuousness and

recklessness that may dominate in younger years can subside.'

(Johnson [v. Texas (1993) 509 U.S , 350, 358, 113 S.Ct. 2658,

125 L.Ed.2d 290]; Roper v. Simmons (2005) 532 U.S. 55

56 -556[, 125 S.Ct. 1183, 161 L.Ed.2d 1]; see also Thompson

v. Oklahoma (1988) 487 U.S. 815, 835[, 108 S.Ct. 2687, 10

L.Ed.2d 702] (Stevens, J.). The Rosenkrantz, court further

stated that:

> ['[L]ess culpability should attach to a crime
> committed by a juvenile than to a comparable
> crime committed by an adult.. Inexperience, less
> intelligence and less education make a teenager
> less able to evaluate the consequences of his or
> her conduct while at the same time mere emotion or
> peer pressure than as an adult.']

(Rosenkrantz v. Marshall, supra, 444 F.Supp.2d at p. 1085,

fn. omitted.) These observations are a fortiori applicable to

this 16-year-old Petitioner who committed this crime.

    In sum, there is no evidence under the "differential

"some evidence" to support the Board's determination that

Petitioner still poses a threat to public safety, therefore,

this petition should be granted.

/////////////

15

## CONTENTION

## III.

### THE BOARD OF PAROLE HEARINGS THREE YEAR DENIAL WAS NOT WARRANTED OR SUPPORTED BY "SOME EVIDENCE AND THEREFORE ARBITRARY AND CAPRICIOUS; WHICH VIOLATED PETITIONER'S STATE AND FEDERAL DUE PROCESS

Petitioner appeared before the Board on August  7, 2007 and was denied parole for three more years. The Board's decision was arbitrary, generally if the Board finds an inmate unsuitable for parole it must conduct subsequent parole consideration hearings annually. (See Penal Code § 3041.5 (b)(2). One exception relevant here is that if an inmate has been convicted of murder, the hearing may be deferred for "up to five years" if the Board "finds that it is not reasonable that parole would be granted at a hearing during th[ose] years." (See Penal Code § 3041. 5(b)(2)(B). The Board's decision to defer the annual hearing is guided by the same criteria used to determine parole suitability. (See Cal. Regs., § 2270(d), citing § 2402).

In an unpublished decision (referred to herein because of its relevance to the instant petition) the Court of Appeals held that an inmate should not receive a multi-year denial when the grounds for unsuitability - namely, limited insight into the instant offense - could not be cured within one year. See In re Lozano, 2007 WL 117709. As applied to Petitioner, any alleged defects in his parole suitability - such as needing additional time for therapy or rehabilitative programming - could be easily accomplished via additional insight within one year. For Petitioner in the instant case, a three year denial

by the Board was arbitrary and capricious given that: (a)
Courts have previously reasoned that the recent timing of
additional insight should not be of relevance in determining
parole suitability (In re Lee, supra); (b) the prison
psychologist did not suggest the need for additional therapy as
being pivotal to Petitioner's risk to society; and (3)
Petitioner's in-custody history does not demonstrate impulse
control issues, assaultive behavior, or other criminal
proclivities which would indicate a need for long-term therapy.

California case law provides that the decision to defer
parole hearing longer than one year "may involve some of the
same facts on which the unsuitability determination is based.
What is required ... is an identification of reasons which
justify the postponement," and a recognition that the Board is
making a separate decision. In re Jackson, (1983) 39 Cal.3d
464, 479; (see also, People v. Belmontes, (1983) 34 Cal.3d 335,
347-348; U.S. v. McCullah, (quoting )Parsons v. Barnes 871 0.2d
516, 529 (Utah) (quoting Cook v. State 369 S0.2d 1251, 1256
(Ala. 1979), cert. denied).)

The Board not only erred in denying parole but in
issuing a multi-year denial of three years because Petitioner's
case for parole (from his previous 2004-2005) had improved, not
worsened, despite the Board's issuance of two year denial. In
fact, since his previous parole denial of two years in 2005,
Petitioner had continued to remain disciplinary free and
program. Petitioner further garnered support for parole and
employment plans. (Exhibit "A" pp. 59-69) In short,
Petitioner's case for parole from 2005 to 2007 had only

improved, not lessened. And yet, the Board issued a three year denial.

California court have recently scrutinized the practice of issuing multi-year denials after single year denials when inmates' parole have improved as indicative of pro forma consideration meant to address the Board's large backlog problem by reducing the number of annual hearings rather than giving the required individualized consideration required as such hearings. In re Rutherford, Case No. SC135399, CA1 No. A114357 (Marin Count Superior Court) (pending appeal). In In re Rutherford, which is styled as a class action, the Marin County Superior Court prescribed remedies and scheduling requirements to eliminate the 3,000 plus cases of late parole hearings by setting limits on the circumstances under which a panel could issue a multi-year denial.

As previously pointed out, the Board must do more than merely commend Petitioner for his programmatic achievements while in prison. They must actually consider these factors "as circumstances tending to show suitability for parole." Ramirez, (2001) 94 Cal.App.4th 571-72.

Furthermore, there is nothing in the entire record of numerous psychological evaluations to suggest that Petitioner needs additional time for self-help or therapy. To the contrary, Petitioner's most recent psychological evaluation found that he was a low risk for violence, and that his level of recidivism to repeat it all is low. Exhibit "A" p. 57. Under California law, Ramirez, supra, at 571-572 the Board cannot ask for any specific programming when it is not supported by the a

professional psychologist or psychiatrist's reports. Ramirez, found, "The Board's readiness to make a finding so at odds with the record supports Ramirez's claim that his parole hearing was a sham. It is not surprising that the trial court regarded the Board's finding with deep suspicion." The same may be said in Petitioner's case when the Board calls for three years of additional self-help when none is mandated by the Board's own hired, professional psychologist, or evidenced by Petitioner's in-custody history.

## CONTENTION

### IV.

#### THE BOARD'S CHARACTERIZATION OF VIRTUALLY EVERY TERM TO LIFE PRISONER'S COMMITMENT OFFENSE AS BEING EXCEPTIONAL UNDER ITS OWN REGULATIONS AND STATUTES RENDERS THE REGULATIONS UNCONSTITUTIONALLY VAGUE AS APPLIED IN VIOLATION OF STATE AND FEDERAL DUE PROCESS

Petitioner contends that the State regulations defining parole "suitability" and "unsuitability" set forth in Cal. Regs. § 2042 (c)(1), are intolerably vague such that he did

not have notice that the factors would apply to him based upon the circumstances of his commitment offense.

The vagueness doctrine is an aspect of due process and requires that the meaning of a penal statute be determinable. A statute is void for vagueness if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes, see Coates v. City of Cincinatti, 402 U.S. 611, 614 (1971), or if it invites arbitrary and discriminatory enforcement, Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972). (See also, Jordan v De George, 341 U.S.

19

223, 231-32 (1951). Neither of these strands may be applied mechanically, however, but by a reasoning process. This follows because potential criminals do not necessarily learn what is forbidden by reading a statute's literal language or cases construing the statutory language and because, although "[a] vague statute may invite arbitrary enforcement , . . virtually any law allows it." P. Low. J. Jeffries & R. Bonnie, Criminal Law 68-69 (1982). Judgement is necessary to determine "[t]he degree of vagueness that the Constitution tolerates - as well as the relative importance of fair notice and fair enforcement" and this, in turn, "depends in part on the nature of the enactment." Village of Hoffman Estate v. The Flipside, Hoffman Estates, Inc.. 455 U.S. 489, 498 (1982); (See also, United States v. Petrillo, 332 U.S. 1, 7-8 (1947) ("[T]he Constitution does not require impossible standards.") The threshold question in a vagueness challenge is "whether to scrutinize the statute for intolerable vagueness on its face or whether to do so only as the statue is applied in a particular case. Schwartzmiller v. Gardner, 752 F.2d 1341, 1346 (9th Cir. (1984).

The arbitrary and capricious manner in which the Board applied the regulations in determining that Petitioner is not suitable for parole renders the regulations "vague as applied." Vagueness as applied is particularly so because the Board habitually, as a manner of policy, makes the determination that every life term prisoner's commitment offense is exceptional under section 2402 (c)(1).

Petitioner ask this Court to take notice pursuant to Evidence Code 452 (d) of the facts established in the following

cases now pending before the Santa Clara County Superior Court: In re Lewis, #68038; In re Criscione, #71614; In re Bragg, # 108543; In re Ngo, #127611. In these cases, five individual life-term prisoners were granted discovery orders in the course of prosecuting their petitions challenging parole denials. Each alleged, as does Petitioner, that the Board abuses its discretion by declaring every life-term crime exceptional under section 2402 (c)(1). During discovery in these cases, the Board s suitability decisions were examined and findings presented by the court at the evidentiary hearings established that in 100 percent of the 2690 cases reviewed the Board found the inmate's commitment offense to have been committed in an especially heinous, atrocious or cruel manner as defined by section 2402 (c). Accordingly, even if the standards set out in section 2402 (c)(1) are not unconstitutionally vague on their face, the Board's application of these standards renders them void in their application.

> ⌈Courts have] an obligation, however, to look beyond the facial validity of a statute that is subject to possible unconstitutional administration since a "law though  fair on its face and impartial in appearance' may be open to serious abuses in administration the courts may be imposed upon if the substantial rights of the person charged are not adequately safeguarded at every stage of the proceedings, but also to the administration of the Indeterminate Sentencing Law.

(In re Rodriguez, 14 Cal.3d 639, 648 (Cal. 1975) (quoting Minnesota v. Probate Court 309 U.S. 270, 277 (1940), ⌈84 L.Ed. 744, 751, 60 S.Ct. 523, 126 A.L.R. 530].)

This Court should declare the California Code of Regulations Title 15 section 2402 unconstitutionally vague.

## CONTENTION

**V.**

### THE SUPERIOR COURT DECISION WAS AN UNREASONABLE DETERMINATION OF STATE AND FEDERAL LAW, AND OR; AN UNREASONABLE DETERMINATION OF THE FACTS, THEREBY VIOLATING PETITIONER'S DUE PROCESS RIGHTS

On December, 2007, Petitioner received a denial of his habeas petition claims by the superior court. Exhibit "B" The superior court decision was an unreasonable determination of state and federal law, thereby violating Petitioner's due process. The superior court did nothing more than repeat the Board's decision. The superior court did no t state why or how the Board's decision provided "some evidene" nothing in the record substanstiates the one overarching factor that Petitioner is still a threat to pulic safety. Recently, the United States Court of Appeals for the Ninth Circuit held that the very same factors the Board and the superior court upheld in this instant action, were over seeral years (50) ago and did not support the decision that he still posed a threat to society. (RONALD HAYWARD v. JOHN MARSHALL Case No. 06-55392 (2008) p. 53) Although the psychologist in the HAYWARD case found that Hayward posed "a low-to-moderate risk of danger to society."

If the circumstances of Petitioner's offense and past criminal and social behavior can be used after over 15 years, then Petitioner can be forever denied parole even though those factors do not provide evidence that Petitioner still poses a threat to public safety. Nor do these factors provide evidence that a three year denial is warranted or justified. (HAYWARD, supra, at p. 54).

The superior court found that the Board used the other factors other than the commitment offense to justify their denial of parole. The superior court upheld the Board's decision, pointing out that Petitioner's disciplinary record, that was over 14 years old, and that the psychologist's report that was not totally supportive of parole, along with Petitioner's "limited capacity for insight, were sufficient reasons to deny Petitioner parole. The factors relied on by the Board must reliably evidence a prisoner is still a threat to public safety.

> "Thus, it is not enough that there is some evidence
> to support the factors cited for denial; that evidence
> must also rationally support the core determination
> required by the statute before parole an be denied.
> i.e., that a prisoner's release will unreasonably
> endangers public safety."

(See In re Lee, (2006) 143 Cal.App.4th 1400, 1408; In re De Luna, (2005)126 Cal.App.4th 58, 591.)

Recently, In another recent decision by this Court in In re Dannenberg, Case No. H03003 (11/16/07), the Dannenberg Court pointed to In re Jacobson, (2007) 154 Cal.App.4th 849, stating: "Jacobson held that a parole unsuitability decision must be upheld so long as some evidence supports a finding that the offense was "especially heinous" without regard to whether there is a nexus between this finding and a conclusion that the prisoner currently poses an unreasonable risk of danger to society if released. We reject this criticism of Scott, Lee, and Elkins.

Thus, continued reliance on factors that have already been used to deny parole, by defacto turns Petitioner's offense into a sentence of life without the possibility of parole.

23

For the above mentioned reasons this Court should grant relief prayed for.

### PRAYER FOR RELIEF

**WHEREFORE**, Petitioner respectfully prays that this Court would:

1. Issue writ of habeas corpus;'

2. Issue an Order to Show Cause;

3. Order an Evidentiary Hearing;

4. Order the Board to immediately schedule Petitioner for a new parole consideration hearing that comports with due process;

5. Order the Board to set Petitioner a parole date and immediately release him;

6. Appoint Counsel;

7. Grant any and all other relief deemed appropriate.


Dated: this _27_ , day of May 2008.

Osvaldo Elias
**In Pro Se**

24

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )
Hearing of: )  CDC Number K-50464
)
OSVALDO ELIAS )
_____)

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

AUGUST 7, 2007

6:20 P.M.

PANEL PRESENT:

Janice Eng, Presiding Commissioner
Deborah Star, Deputy Commissioner

OTHERS PRESENT:

Osvaldo Elias, Inmate
Paul Stringer, Attorney for Inmate
Correctional Officer(s) Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No      See Review of Hearing
_____ Yes     Transcript Memorandum

**KERRY VIENS**

**FOOTHILL TRANSCRIPTION COMPANY, INC.**

ii

INDEX

Page

Proceedings .............................................. 1

Case Factors ............................................ 11

Pre-Commitment Factors .................................. 29

Post-Commitment Factors ................................. 38

Parole Plans ............................................ 59

Closing Statements ...................................... 92

Recess ................................................. 100

Decision ............................................... 101

Adjournment ............................................ 114

Transcriber Certification .............................. 115

--oOo--

1

```
1                    P R O C E E D I N G S
2            PRESIDING COMMISSIONER ENG:  How you doing,
3      Mr. Elias?
4            INMATE ELIAS:  Well, we got dinner anyway.
5            PRESIDING COMMISSIONER ENG:  You got dinner.
6      Did you bring us any?
7            INMATE ELIAS:  No.
8            PRESIDING COMMISSIONER ENG:  Are we on the
9      record?
10           DEPUTY COMMISSIONER STAR:  Yes.  We're on.
11           PRESIDING COMMISSIONER ENG:  All right.  This
12     is a subsequent Parole Consideration Hearing for
13     Osvaldo Elias, CDC number K-50464.  Today's date is
14     August 7th, 2007, and the time is 6:20 in the evening.
15     We're located at San Quentin State Prison.  The inmate
16     was received on May 12th, 1997, from Alameda County.
17     His life term began on that same date, May 12th, 1997,
18     and his minimum eligible parole date was August 4th,
19     2003.  The controlling offense for which the inmate has
20     been committed is Murder 2, case number 115461, Count
21     1, Penal Code 187, along with Penal Code 12021.5, Armed
22     with a Firearm.  The inmate received a total term of 16
23     years to life.  This hearing is being recorded, so, for
24     the purpose of voice identification, each of us will be
25     required to state our first and last name, spelling out
```

1    our last name.  So, Mr. Elias, after you spell your

2    last name, please provide us with your CDC number.

3    I'll go first, and we'll move around the room to my

4    left.  My name's Janice Eng, E-N-G, Commissioner.

5          **DEPUTY COMMISSIONER STAR:**  Deborah Star,

6    S-T-A-R, Deputy Commissioner with the Board of Parole

7    Hearings.

8          **ATTORNEY STRINGER:**  John Stringer,

9    S-T-R-I-N-G-E-R, attorney.

10         **INMATE ELIAS:**  Osvaldo Elias, E-L-I-A-S, CDC

11   number, K-50464.

12         **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.

13   For the record, we have two correctional officers

14   present for security reasons, and they will not be

15   participating in the hearing.  Before I go any

16   further -- I apologize up front if I mispronounced your

17   name and any other Spanish name because I have a

18   terrible pronunciation.  Okay.  Sir, would you kindly

19   read aloud that ADA statement that's in front of you,

20   and you can begin at any time.

21         **INMATE ELIAS:**  "The Americans with

22              Disabilities Act, ADA, is a law to help

23              people with disabilities.  Disabilities

24              are problems that make it harder for some

25              people to see, hear, breathe, talk, walk,

1            learn, think, work, or take care of
2            themselves than it is for others.  Nobody
3            can be kept out of public places or
4            activities because of a disability.  If
5            you have a disability, you have the right
6            to ask for hem to get ready for your BPT
7            hearing, get to the hearing, talk, read
8            forms and papers, and understand the
9            hearing process.  BPT will look at what
10           you asked for to make sure that you have
11           a disability that is covered by the ADA
12           and that you have asked for the right
13           kind of help.  If you do not get help or
14           if you don't think you got the kind of
15           help you need, ask for a BPT 1074
16           grievance form.  You can also get help to
17           fill it out."

18      **PRESIDING COMMISSIONER ENG:**  Okay.  Sir, in
19 general, do you understand what your rights are under
20 · the ADA?

21      **INMATE ELIAS:**  Yes.

22      **PRESIDING COMMISSIONER ENG:**  All right.  Just
23 to be sure, we'll cover a few more things.  For the
24 record, I see that you signed a BPT 1073 back on April
25 6th, 2007.  That form is the reasonable accommodation

4

1    notice and request in accordance with the provisions of

2    the ADA.  All that means is that this is the form that

3    you would use to identify if you have any of the

4    disabilities as defined under ADA.  You checked off

5    that you do not.  You also checked off that you don't

6    need any help for your parole hearing and that you do

7    appear to understand what your rights are.  So is that

8    information current and correct?

9         **INMATE ELIAS**:  Incorrect?

10        **PRESIDING COMMISSIONER ENG**:  Correct?  Is it

11   current and correct?

12        **INMATE ELIAS**:  Yes.

13        **PRESIDING COMMISSIONER ENG**:  Okay.  Do you have

14   any problems walking up or down stairs or for distances

15   of 100 yards or more?

16        **INMATE ELIAS**:  No.

17        **PRESIDING COMMISSIONER ENG**:  Okay.  And do you

18   need glasses or a magnifying device in order to read or

19   see documents?

20        **INMATE ELIAS**:  No.

21        **PRESIDING COMMISSIONER ENG**:  And do you have

22   any hearing impairments?

23        **INMATE ELIAS**:  No.

24        **PRESIDING COMMISSIONER ENG**:  And have you ever

25   been included in the Triple CMS or EOP programs?

1        **INMATE ELIAS:**  No.

2        **PRESIDING COMMISSIONER ENG:**  Do you know what

3   those are?

4        **INMATE ELIAS:**  Yes.

5        **PRESIDING COMMISSIONER ENG:**  Are you sure?

6        **INMATE ELIAS:**  I believe so.

7        **PRESIDING COMMISSIONER ENG:**  You'd pretty much

8   know it if you were in one of those programs, right?

9        **INMATE ELIAS:**  Yeah, pretty much.

10        **PRESIDING COMMISSIONER ENG:**  Okay.  Have you

11   taken any psychotropic medications either in prison or

12   on the streets?

13        **INMATE ELIAS:**  No.

14        **PRESIDING COMMISSIONER ENG:**  Okay.  How far did

15   you get in school?

16        **INMATE ELIAS:**  To the eighth grade.

17        **PRESIDING COMMISSIONER ENG:**  Yeah.  Okay.  You

18   dropped out when you were about 13?

19        **INMATE ELIAS:**  Yes.

20        **PRESIDING COMMISSIONER ENG:**  Is that it?  Okay.

21   When you were growing up, were you enrolled in any

22   special education classes?

23        **INMATE ELIAS:**  No.

24        **PRESIDING COMMISSIONER ENG:**  So, do you suffer

25   from any disability that would prevent you from

1    participating in the hearing today?

2         **INMATE ELIAS:** No.

3         **PRESIDING COMMISSIONER ENG:** Mr. Stringer, any

4    ADA issues that you believe need further discussion.

5         **INMATE ELIAS:** Commissioner, in my judgment, my

6    client can meaningfully participate in this hearing.

7         **PRESIDING COMMISSIONER ENG:** All right.  Thank

8    you, sir.  Mr. Elias?

9         **INMATE ELIAS:** Yes.

10        **PRESIDING COMMISSIONER ENG:** Elias?

11        **INMATE ELIAS:** Yes.

12        **PRESIDING COMMISSIONER ENG:** Okay.  Mr. Elias,

13   this hearing is being conducted pursuant to the Penal

14   Code and the rules and regulations of Board of Parole

15   Hearings governing Parole Consideration Hearings for

16   life inmates.  So, the purpose of the hearing today is

17   to, once again, consider your suitability for parole.

18   So, in doing that, we'll be considering the number and

19   the nature of the crime for which you were committed,

20   your prior criminal and social history, your behavior

21   and programming since your commitment, and your plans

22   if released.  So, we've already had an opportunity to

23   review your Central File, and you'll also be given an

24   opportunity to make any corrections or clarify the

25   record for us.  Okay.  We will consider your progress

1    since your commitment, your counselor's reports, and
2    your mental health evaluations. But we will focus on
3    any new reports and your progress since your last
4    hearing. So if you've had changes to your parole plans
5    or anything else, you should bring that to our
6    attention. Okay. And I see, for the record, that the
7    last time you came before a Panel was back in May 19th,
8    2005; is that correct?

9         **INMATE ELIAS:** Yes.

10        **PRESIDING COMMISSIONER ENG:** Okay. Sir, we
11   will reach a decision today and inform you whether or
12   not we find you suitable for parole, and, of course,
13   the reasons for our decision. So, if you are found
14   suitable for parole, the length of your confinement
15   will be explained to you at that time.

16        **INMATE ELIAS:** Okay.

17        **PRESIDING COMMISSIONER ENG:** Okay. Before we
18   take a recess for deliberations, unfortunately, the
19   representative from the District Attorney's office had
20   to leave earlier this afternoon as we, our schedule, as
21   you well know, became rather convoluted. So he did
22   leave us with a letter that confirms his position.
23   However, Mr. Stringer and you yourself will both have
24   an opportunity to make a final statement regarding
25   parole suitability. Okay. You don't have to make a

1    statement.  But, if you chose to, you should focus on
2    why you believe you're suitable for parole today.
3    Okay.  After that, we'll go ahead and take a recess,
4    we'll clear the room, we'll begin our deliberations and
5    once we conclude our deliberations, we'll resume the
6    hearing and announce our decision.  So, the California
7    Code of Regulations states that regardless of time
8    served, a life inmate shall be found unsuitable for and
9    denied parole if, in the judgment of the Panel, the
10   inmate would pose an unreasonable risk of danger to
11   society if released from prison.  Sir, you have certain
12   rights.  Those rights do include the right to a timely
13   notice of this hearing, the right to review your
14   Central File, and the right to present relevant
15   documents.  So, Mr. Stringer, so far, have your
16   client's rights been met?

17            **ATTORNEY STRINGER:**  As to those rights, yes,
18   Commissioner.

19            **PRESIDING COMMISSIONER ENG:**  You also have the
20   additional right to be heard by an impartial Panel, so
21   you've been introduced to this Panel, do you have any
22   objections?

23            **INMATE ELIAS:**  No.

24            **PRESIDING COMMISSIONER ENG:**  Okay.

25   Mr. Stringer, any objections to the Panel?

9

1        **INMATE ELIAS:**  I do not Commissioner.

2        **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.

3   Sir, you will receive a copy of our written, tentative

4   decision today, and that decision does become final

5   within approximately 120 days.  So a copy of the final

6   decision and a copy the hearing transcript will be sent

7   to you later on.  Please do note, though, that on May

8   1st, 2004, the regulations regarding your right to

9   appeal a decision made at this hearing were repealed.

10  Now you have to basically go to court.  So, if you have

11  any questions about that policy, you should discuss

12  that with your legal counselor review the policy at

13  your prison law library.

14       **INMATE ELIAS:**  Okay.

15       **PRESIDING COMMISSIONER ENG:**  Sir, you are not

16  required to admit to or discuss your offense, but this

17  Panel does accept as true the findings of the court.

18  Do you understand what that means?

19       **INMATE ELIAS:**  Yes.

20       **PRESIDING COMMISSIONER ENG:**  You seemed a

21  little uncertain about that.

22       **INMATE ELIAS:**  I understand what you mean.

23       **PRESIDING COMMISSIONER ENG:**  Okay.  We're not

24  here to retry the case or anything.  It is what it is.

25       **INMATE ELIAS:**  Yes.

1       **PRESIDING COMMISSIONER ENG:** Okay?  Okay.

2  Commissioner Star, is there any confidential material

3  in the files; and, if so, will we be using it?

4       **DEPUTY COMMISSIONER STAR:** There's confidential

5  material in the file, but we will not be using it.

6       **PRESIDING COMMISSIONER ENG:** All right.  Thank

7  you.  I've already passed the hearing checklist over to

8  Mr. Stringer, and I know both of us signed off on it.

9  This is labeled Exhibit 1.  We do this to make sure

10  that all of us are operating off of same set of

11  documents for your hearing.  Okay.  So, Mr. Stringer,

12  any additional documents to be submitted?

13       **ATTORNEY STRINGER:** Commissioner, I have

14  several additional letters that have been faxed to my

15  office.  However, some of them may be redundant, so I

16  will reserve the right to submit them after the Board

17  reviews the letters in their possession.

18       **PRESIDING COMMISSIONER ENG:** All right.  Thank

19  you.  Any preliminary objections?

20       **ATTORNEY STRINGER:** We're ready to proceed.

21       **PRESIDING COMMISSIONER ENG:** Okay.  And will

22  your client be speaking with the Panel today?

23       **ATTORNEY STRINGER:** He will.

24       **PRESIDING COMMISSIONER ENG:** On all matters?

25       **ATTORNEY STRINGER:** All matters.

11

1        **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.
2   And I know I'm going to mispronounce your name again.
3   I want to keep saying Elias, but Elias.  Mr. Elias,
4   I'll have to swear you in.  Please raise your right
5   hand.  Do you solemnly swear or affirm that the
6   testimony you give at this hearing will be the truth,
7   the whole truth, and nothing but the truth?

8        **INMATE ELIAS:**  Yes.

9        **PRESIDING COMMISSIONER ENG:**  Okay.  Try to sit
10  back.  Take a few deep breathes.  Okay.  You at least
11  had dinner.  All right.  I'm going to read into the
12  record now the statement of facts about the crime
13  itself, and I'm going to take that from the probation
14  officer's report in the legal section of our packets,
15  and it is rather short, and this does state on Page 2
16  that:

17            "On October 3rd, 1991, the Oakland Police
18            Department responded to a report of a
19            drive-by shooting at the corner of 94th
20            Avenue and A Street.  Officers found a
21            14-year-old teenager, Adolpho Espinoza on
22            the ground suffering from three gunshot
23            wounds.  The victim was transported to
24            the county hospital where he died the
25            next day.  It appears that the victim was

```
1              standing on the corner when a large,
2              dark-colored sedan drove by with the
3              occupants, shooting at the victim.  The
4              follow-up investigation points to three
5              young men being involved in this offense,
6              Cesar Estrada is alleged to have been the
7              driver of the car which contained Jose
8              Cervantes and Osvaldo Elias.  It is
9              Cervantes and Elias who are alleged to
10             have fired their separate guns at the
11             victim who was killed."
12             So, that wasn't that long ago, 1991.  Okay.
13      What I just read, sir, is that what happened?
14             INMATE ELIAS:  Yes.
15             PRESIDING COMMISSIONER ENG:  So both you and
16      Mr. Cervantes both had loaded weapons in the car?
17             INMATE ELIAS:  Yes.
18             PRESIDING COMMISSIONER ENG:  What kind of a
19      weapon did you have?
20             INMATE ELIAS:  .38.
21             PRESIDING COMMISSIONER ENG:  Had you used it
22      before?
23             INMATE ELIAS:  No.
24             PRESIDING COMMISSIONER ENG:  Then can you
25      explain to us, what, you know, what provoked you to end
```

13

1     up shooting and hitting this young boy?

2          **INMATE ELIAS:** Well, initially, it was a thing

3     involved with gangs, that before this incident, they

4     had jumped on my (inaudible) the home boy in the

5     neighborhood, so it was just a thing of rivalry to

6     where we just took (inaudible). But it didn't

7     necessarily have to do just with that incident. See,

8     the reason for me being there, why I was there actually

9     had to do with a whole different incident because I had

10    found out that those on that side of the neighborhood,

11    there was one individual that I was actually looking

12    for.

13         **PRESIDING COMMISSIONER ENG:** When you were

14    driving around in the car?

15         **INMATE ELIAS:** Yes.

16         **PRESIDING COMMISSIONER ENG:** Okay.

17         **INMATE ELIAS:** And I was actually looking for

18    somebody.

19         **PRESIDING COMMISSIONER ENG:** Not this Adolpho

20    Espinoza?

21         **INMATE ELIAS:** No.

22         **PRESIDING COMMISSIONER ENG:** Was he on the

23    corner by himself or was he with a crowd of people and

24    just ended up being the unlucky one to receive the

25    bullet.

14

1       **INMATE ELIAS:**  Honestly, I don't remember.
2  Honestly, I don't.
3       **PRESIDING COMMISSIONER ENG:**  So you were really
4  looking for somebody else in this rival gang, correct?
5       **INMATE ELIAS:**  Yes.
6       **PRESIDING COMMISSIONER ENG:**  And the two people
7  that you were riding around in the car with, were those
8  your gang member friends?  All of you were with the
9  Fruit Vale Gang system?
10       **INMATE ELIAS:**  Yes.
11       **PRESIDING COMMISSIONER ENG:**  The FVG.  Okay.
12  And so were you looking for Border Brothers?
13       **INMATE ELIAS:**  Yes.
14       **PRESIDING COMMISSIONER ENG:**  Did you have any
15  idea if Espinoza was one of these Border Brothers?
16       **INMATE ELIAS:**  No, I didn't.
17       **PRESIDING COMMISSIONER ENG:**  So whose idea,
18  when you saw him standing there whose idea was it to
19  learn out of the car and fire your weapons?
20       **INMATE ELIAS:**  We just seen him.  We just -- if
21  I remember correctly, I just seen him right there
22  standing in the neighborhood.  It wasn't no -- we
23  didn't know who he was.  I did not know who he was.
24       **PRESIDING COMMISSIONER ENG:**  Okay.  So this
25  other person, did you ever find this other person?

1        **INMATE ELIAS:**  No.

2        **PRESIDING COMMISSIONER ENG:**  Why were you

3    looking for this other person?

4        **INMATE ELIAS:**  Because I had found out prior

5    that -- that this one individual actually tried to rape

6    my girlfriend.  My daughter was one at the time.

7        **PRESIDING COMMISSIONER ENG:**  Who told that you?

8        **INMATE ELIAS:**  My daughter's mother.

9        **PRESIDING COMMISSIONER ENG:**  So she accused

10    someone.  Did she name him?

11        **INMATE ELIAS:**  No.

12        **PRESIDING COMMISSIONER ENG:**  She just said that

13    one of the -- one of these Border Brothers tried to

14    rape me?

15        **INMATE ELIAS:**  Well, not necessarily try to

16    rape her in that sense, but I guess she was at a party,

17    and I guess he tried to take advantage of her because

18    she was a little drunk.  I caught wind of it.

19        **PRESIDING COMMISSIONER ENG:**  So, when did you

20    find this out relative to October 3rd?

21        **INMATE ELIAS:**  This happened a few weeks before

22    that.

23        **PRESIDING COMMISSIONER ENG:**  So had you been

24    searching the streets since the date that you she told

25    you up until October 3rd?

1          **INMATE ELIAS:** No.

2          **PRESIDING COMMISSIONER ENG:** So why October

3     3rd?

4          **INMATE ELIAS:** Just we were in the

5     neighborhood. I was just driving around in that

6     neighborhood and -- I asked sometimes she (inaudible).

7          **PRESIDING COMMISSIONER ENG:** Let me ask you

8     this: Did you typically go around with a loaded weapon

9     on you? Was that part of being one of the FVG's?

10          **INMATE ELIAS:** Sometimes.

11          **PRESIDING COMMISSIONER ENG:** When you were

12     going out together, all right, did you -- were you

13     typically armed?

14          **INMATE ELIAS:** Sometimes.

15          **PRESIDING COMMISSIONER ENG:** Just some of the

16     time. So, what was different about this October 3rd?

17          **INMATE ELIAS:** As I said, prior to that --

18     before -- after this incident with my daughter's mother

19     what happened was that a home boy had gotten jailed by

20     those Border Brothers, so that's particularly why we

21     were actually there. I never told anybody about what

22     happened between what my daughter's mother.

23          **PRESIDING COMMISSIONER ENG:** Okay.

24          **INMATE ELIAS:** I didn't want nobody to know.

25     Only I knew.

1       **PRESIDING COMMISSIONER ENG:** But you figured.
2       **INMATE ELIAS:** I figured, okay, you know what,
3  now I can take action. I could do it at the same time
4  with them jumping the home boy I could, you know, also
5  do it.

6       **PRESIDING COMMISSIONER ENG:** Okay. So, when
7  the car was going by, the victim was standing there,
8  were both you and Mr. Cervantes in the back seat or was
9  one in front and one was in the back seat and you were
10  both facing on the same side of the car?

11      **INMATE ELIAS:** I was in the back seat.

12      **PRESIDING COMMISSIONER ENG:** Was he sitting in
13  front of you.

14      **INMATE ELIAS:** Yeah.

15      **PRESIDING COMMISSIONER ENG:** So you're both on
16  the same side of the car?

17      **INMATE ELIAS:** Yeah.

18      **PRESIDING COMMISSIONER ENG:** So both of you
19  hung out the window and both of you started shooting?

20      **INMATE ELIAS:** Well, we didn't hang out the
21  window, but, yeah, we shot out of the car.

22      **PRESIDING COMMISSIONER ENG:** Okay. So do you
23  know, when you shot out, did you know that you hit
24  someone?

25      **INMATE ELIAS:** No.

1      **PRESIDING COMMISSIONER ENG:** Did the car just

2   keep moving? Did the car stop and you shot or did it

3   just keep moving?

4      **INMATE ELIAS:** It just kept moving.

5      **PRESIDING COMMISSIONER ENG:** And were you

6   shooting and neither one of had you any idea whether or

7   not you hit someone?

8      **INMATE ELIAS:** No.

9      **PRESIDING COMMISSIONER ENG:** When did you find

10   out?

11      **INMATE ELIAS:** The next day.

12      **PRESIDING COMMISSIONER ENG:** How?

13      **INMATE ELIAS:** It was in the newspaper.

14      **PRESIDING COMMISSIONER ENG:** You saw the

15   newspaper. One of your buddies didn't call you and

16   say, 'Hey, this is what happened'?

17      **INMATE ELIAS:** Somebody showed me the paper.

18      **PRESIDING COMMISSIONER ENG:** When did you get

19   picked up for it?

20      **INMATE ELIAS:** I don't remember.

21      **PRESIDING COMMISSIONER ENG:** Was it a long time

22   or was it short?

23      **INMATE ELIAS:** Oh, it was about a year after.

24      **PRESIDING COMMISSIONER ENG:** A year after.

25   Okay. How about Mr. Cervantes?

1           **INMATE ELIAS:** I don't remember.

2           **PRESIDING COMMISSIONER ENG:** Okay. So, how old

3     were you? I thought I saw somewhere that you really

4     started affiliating and joining the FVG gang when you

5     were about 13; is that correct?

6           **INMATE ELIAS:** Yes.

7           **PRESIDING COMMISSIONER ENG:** And was it for

8     drugs or drinking or girls or guns or fights? What was

9     the reason?

10          **INMATE ELIAS:** The reason for me to join?

11          **PRESIDING COMMISSIONER ENG:** Yeah. What

12    attracted you to it?

13          **INMATE ELIAS:** I'm not going to say that

14    something attracted me to it. Going on, when I was

15    going to school, I was growing up in Catholic school,

16    and that created a problem with some people. So,

17    basically, the friends that I had at school, basically

18    they have (inaudible). I was basically alone, so I had

19    a problem with some people, so I figured I started

20    hanging around with a whole give crowd that didn't have

21    my back, and that's what I did. That's how I started

22    getting involved with gangs. These others in the

23    neighborhood had my back, and the friends that I had at

24    school didn't, so when it came time when somebody

25    wanted to harass me, I looked to this crowd.

1          **PRESIDING COMMISSIONER ENG:**  You had

2    protection?

3          **INMATE ELIAS:**  Yeah.

4          **PRESIDING COMMISSIONER ENG:**  Okay.  When was

5    the first time you shot a gun?

6          **INMATE ELIAS:**  The first time I shot a gun?  I

7    can't quite remember.  I can't quite remember exactly

8    when that was.  I think I was -- I think we're talking

9    about 14.

10         **PRESIDING COMMISSIONER ENG:**  And when you shot

11   the gun, were you shooting at a person?

12         **INMATE ELIAS:**  No, no.

13         **PRESIDING COMMISSIONER ENG:**  When was the first

14   time you used a gun against a person?

15         **INMATE ELIAS:**  Just this one time.

16         **PRESIDING COMMISSIONER ENG:**  How did you feel

17   when you found out and you looked in the paper -- when

18   somebody told you to look at the paper and found out a

19   14-year-old boy was dead?  What went through your head?

20         **INMATE ELIAS:**  I wasn't happy about it.  I

21   didn't want someone to die.  It was horrible that this

22   happened to happen.

23         **PRESIDING COMMISSIONER ENG:**  Well, would you

24   have felt differently if you had actually hit the guy

25   that you thought made a pass at your girlfriend?  Would

1    you have felt differently?

2            **INMATE ELIAS:**  Honestly, I don't know.  I can't

3    really answer that because --

4            **PRESIDING COMMISSIONER ENG:**  Because this kid,

5    you didn't know, did you?

6            **INMATE ELIAS:**  I didn't know him.

7            **PRESIDING COMMISSIONER ENG:**  Did you have any

8    idea when you saw his name if he was one of those gang

9    members?

10           **INMATE ELIAS:**  No, I didn't.

11           **PRESIDING COMMISSIONER ENG:**  You never found

12   out.  Okay.  What happened to your friend,

13   Mr. Cervantes?

14           **INMATE ELIAS:**  He got the same amount of time.

15           **PRESIDING COMMISSIONER ENG:**  How about the

16   driver?  Mr. Estrada?

17           **INMATE ELIAS:**  He didn't get nothing.

18           **PRESIDING COMMISSIONER ENG:**  Okay.

19   Commissioner Star, do you have any questions right now?

20           **DEPUTY COMMISSIONER STAR:**  Just a couple, sir.

21   You said a home boy had gotten jumped.  How many days

22   before this drive-by?

23           **INMATE ELIAS:**  The day before.

24           **DEPUTY COMMISSIONER STAR:**  The day before.  And

25   this particular corner that you turned and decided to

1    shoot, did you see a person on the corner?

2         **INMATE ELIAS:**  Yes.

3         **DEPUTY COMMISSIONER STAR:**  Did you believe he

4    was a Border Brother?

5         **INMATE ELIAS:**  Yeah.

6         **DEPUTY COMMISSIONER STAR:**  Yeah?

7         **INMATE ELIAS:**  Just the way he was dressed.

8         **DEPUTY COMMISSIONER STAR:**  Was he wearing

9    colors?

10        **INMATE ELIAS:**  No.  It's not about wearing

11   colors.  It's just you see the people and you already

12   know that they're from a different neighborhood.

13        **DEPUTY COMMISSIONER STAR:**  Were you in an area

14   that would be labeled their area?

15        **INMATE ELIAS:**  Yes.

16        **DEPUTY COMMISSIONER STAR:**  Was it daytime or

17   nighttime?

18        **INMATE ELIAS:**  Nighttime.

19        **DEPUTY COMMISSIONER STAR:**  Okay.  So, did you

20   know the person that's somebody who ran with the Border

21   Brothers or just because of the area you thought he

22   might live?

23        **INMATE ELIAS:**  Just the area, I thought he

24   might be in there.

25        **DEPUTY COMMISSIONER STAR:**  Okay.  Did you

1    discuss let's shoot on this corner or this particular

2    area?

3              **INMATE ELIAS:**  No.

4              **DEPUTY COMMISSIONER STAR:**  Did the other guy

5    shoot too?  The other guy with the gun?

6              **INMATE ELIAS:**  Yeah.

7              **DEPUTY COMMISSIONER STAR:**  Do you remember how

8    many times you fired your weapon?

9              **INMATE ELIAS:**  How many times I fired.

10             **DEPUTY COMMISSIONER STAR:**  Your weapon, yes.

11             **INMATE ELIAS:**  Yeah.  I fired one time.

12             **DEPUTY COMMISSIONER STAR:**  Five?

13             **INMATE ELIAS:**  No.  I fired one time.

14             **DEPUTY COMMISSIONER STAR:**  One time.  Okay.

15   Now, I notice in here it says you did not intend to

16   kill anybody.

17             **INMATE ELIAS:**  No.

18             **DEPUTY COMMISSIONER STAR:**  Did you shoot in the

19   air?

20             **INMATE ELIAS:**  No, I didn't.

21             **DEPUTY COMMISSIONER STAR:**  Did you shoot it

22   toward this person?

23             **INMATE ELIAS:**  Yes.

24             **DEPUTY COMMISSIONER STAR:**  Did anybody in the

25   car say let's do this corner or pick this guy?  Did

24

1     anybody make that selection?

2              **INMATE ELIAS:** No.

3              **DEPUTY COMMISSIONER STAR:** Were you drinking

4     that day?

5              **INMATE ELIAS:** No.

6              **DEPUTY COMMISSIONER STAR:** I'm struck by the

7     somewhat, the random nature of this, sir. It's not the

8     person who maybe assaulted your girlfriend. It's not

9     the person who was involved in the jumping of some home

10    boy the day before, and in many areas appears because

11    of that, it's sort of -- it's motivation is even more

12    suspect because it's so random. It makes it even more

13    serious. Do you see that point about that this is

14    random. It wasn't even someone you were targeting or

15    had a reason to target?

16             **INMATE ELIAS:** As I was saying before, it was

17    basically survival. Anybody from that neighborhood

18    will tell you.

19             **DEPUTY COMMISSIONER STAR:** But you went into

20    their neighborhood to do this one; am I correct?

21             **INMATE ELIAS:** Yes.

22             **DEPUTY COMMISSIONER STAR:** And you felt you

23    needed to retaliate for one of yours getting banged?

24             **INMATE ELIAS:** Yes.

25             **PRESIDING COMMISSIONER ENG:** So the three of

25

1    you went there deliberately looking to hurt someone

2    from the rival gang; is that correct?  Is that what

3    you're stating?

4         **INMATE ELIAS:**  Yeah.

5         **PRESIDING COMMISSIONER ENG:**  So you went there

6    with the intent to kill someone?

7         **INMATE ELIAS:**  Not with the intent to kill

8    someone.  We went there with the intent to hurt

9    somebody.

10        **PRESIDING COMMISSIONER ENG:**  To hurt someone.

11   Okay.

12        **INMATE ELIAS:**  And it didn't cross our mind to

13   actually go in and kill somebody.

14        **PRESIDING COMMISSIONER ENG:**  But you figured

15   that if you shot maybe somebody would get hurt?

16        **INMATE ELIAS:**  Yeah.  I mean, we know, growing

17   up you know that, you know that guns can kill somebody.

18   At time, it's not processing through our head that

19   somebody's actually going to die.

20        **DEPUTY COMMISSIONER STAR:**  You were arrested a

21   year later you said?

22        **INMATE ELIAS:**  Yes.

23        **DEPUTY COMMISSIONER STAR:**  Do you know what led

24   to your arrest?

25        **INMATE ELIAS:**  What do you mean what led to my

1    arrest?

2             **DEPUTY COMMISSIONER STAR:**  Well, did some

3    witness come forward?

4             **INMATE ELIAS:**  Yes.

5             **DEPUTY COMMISSIONER STAR:**  Why the year delay?

6             **INMATE ELIAS:**  Well, people came forward.

7             **DEPUTY COMMISSIONER STAR:**  Did you continue to

8    involve yourself in the Fruit Vale Gangsters?

9             **INMATE ELIAS:**  No, I didn't.

10            **DEPUTY COMMISSIONER STAR:**  You stopped at that

11   point?

12            **INMATE ELIAS:**  Yes.  Not exactly up to this

13   point but later on down the line I did.

14            **DEPUTY COMMISSIONER STAR:**  Before you were

15   arrested, you had stopped?

16            **INMATE ELIAS:**  Yes.

17            **DEPUTY COMMISSIONER STAR:**  And what led to that

18   decision?

19            **INMATE ELIAS:**  My daughter.

20            **DEPUTY COMMISSIONER STAR:**  How old was she?

21            **INMATE ELIAS:**  She was already a year old.

22            **PRESIDING COMMISSIONER ENG:**  What about your

23   daughter?  I don't see the connection.  What about your

24   daughter got you to start pulling away from the gang?

25            **INMATE ELIAS:**  Just looking at her every day.

1           **PRESIDING COMMISSIONER ENG:**  Was she born when
2    you did this shooting?
3           **INMATE ELIAS:**  Yeah.
4           **PRESIDING COMMISSIONER ENG:**  So she was a baby?
5           **INMATE ELIAS:**  Yes.
6           **PRESIDING COMMISSIONER ENG:**  Was it fear of
7    getting caught for doing that and going to jail and
8    leaving her?
9           **INMATE ELIAS:**  Yes.
10          **PRESIDING COMMISSIONER ENG:**  Did this go
11   through your mind at all?
12          **INMATE ELIAS:**  Yes.
13          **PRESIDING COMMISSIONER ENG:**  Did you hear any
14   retaliation from the other gang or from your own gang?
15          **INMATE ELIAS:**  No.  I didn't fear retaliation
16   from the other gang.  Not necessarily for me, but for
17   my family.
18          **PRESIDING COMMISSIONER ENG:**  So you were
19   worried about your -- were you married at that point?
20          **INMATE ELIAS:**  No, I was never married.
21          **PRESIDING COMMISSIONER ENG:**  Okay.  So this was
22   with your girlfriend, so you were living together with
23   her and your daughter or no?
24          **INMATE ELIAS:**  Yes.
25          **PRESIDING COMMISSIONER ENG:**  Okay.  Was it easy

28

1  to start pulling away from your gang?

2        **INMATE ELIAS:**  Yes.

3        **PRESIDING COMMISSIONER ENG:**  They just sort of

4  let you walk away and fade into the sunset.  I did not

5  think they played that.

6        **INMATE ELIAS:**  Not necessarily just walking

7  away, you just fade away.  You fade away from hanging

8  around.

9        **DEPUTY COMMISSIONER STAR:**  Your crime was

10  retaliation for something that happened.  Did you not

11  fear because a whole year goes by -- you know, and

12  obviously witnesses eventually came forward, but you

13  didn't feel that the Border Brothers would come after

14  you and your family?

15        **INMATE ELIAS:**  That's what I feared.  I didn't

16  necessarily fear for myself.  I just felt fear for my

17  family.

18        **PRESIDING COMMISSIONER ENG:**  What was that year

19  like?  Did you feel that at any time a bullet with your

20  name on it was going to come out of nowhere?

21        **INMATE ELIAS:**  Yes.

22        **PRESIDING COMMISSIONER ENG:**  You did?  For a

23  whole year until the police got you and probably even

24  after that; is that true?

25        **INMATE ELIAS:**  No, not necessarily.

1          **DEPUTY COMMISSIONER STAR:** There's Border
2    Brothers here inside the institutions. Was that an
3    issue for you?
4          **INMATE ELIAS:** No.
5          **DEPUTY COMMISSIONER STAR:** Why not?
6          **INMATE ELIAS:** I know a lot of them.
7          **DEPUTY COMMISSIONER STAR:** Have you joined up
8    with them?
9          **INMATE ELIAS:** No.
10         **PRESIDING COMMISSIONER ENG:** Generally
11   speaking, when you kill one of theirs, it's not that
12   easy to just be buddy-buddy with them.
13         **INMATE ELIAS:** It's all a different thing in
14   here.
15         **PRESIDING COMMISSIONER ENG:** Well, did you end
16   up affiliating with another gang that's even more
17   powerful in the institution for protection?
18         **INMATE ELIAS:** No.
19         **PRESIDING COMMISSIONER ENG:** You're sure about
20   that?
21         **INMATE ELIAS:** Yes.
22         **PRESIDING COMMISSIONER ENG:** Okay. Let's go
23   on. We can ask some follow-up questions later on, but
24   I want to take a look at your background a bit. As a
25   juvenile, which you were a juvenile when you committed

1   this.  Prior to this happening, had you been picked up

2   or had you had any contact with law enforcement

3   whatsoever?

4          **INMATE ELIAS:**  No.

5          **PRESIDING COMMISSIONER ENG:**  And yet you had

6   been hanging out with this gang for at least three

7   years prior to this instant offense, so you managed to

8   stay out of trouble.  Were you drinking or doing drugs

9   with the guys at all?

10         **INMATE ELIAS:**  Drinking once in a while.

11         **PRESIDING COMMISSIONER ENG:**  Okay.  So I see no

12  juvenile record.  Of course, I'm not going to see an

13  adult record because when we take a look at your

14  personal history, you were born November 28th, 1974,

15  correct?

16         **INMATE ELIAS:**  Yes.

17         **PRESIDING COMMISSIONER ENG:**  Okay.  So you were

18  16 when you committed this life offense; is that

19  correct?

20         **INMATE ELIAS:**  Yes.

21         **PRESIDING COMMISSIONER ENG:**  Were your two

22  crime partners, were all of you about the same age?

23         **INMATE ELIAS:**  Yeah.  We were.

24         **PRESIDING COMMISSIONER ENG:**  Okay.  And you're

25  now 32?

1          **INMATE ELIAS:**  Yes.

2          **PRESIDING COMMISSIONER ENG:**  You spend a lot of

3    time -- you spent half of your life incarcerated.

4    Okay.  Let's take a look at some of your -- I have to

5    dig to find any personal information here.  Were you

6    born in LA?  I'm sorry.  No.  We're not talking about

7    LA, are we?  We're talking about Alameda County.  I got

8    a little confused there.  Were you born in Northern

9    California?

10         **INMATE ELIAS:**  Yes.

11         **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.  Both

12   parents.  Was the family intact?

13         **INMATE ELIAS:**  Yes.

14         **PRESIDING COMMISSIONER ENG:**  How many brothers

15   and sisters?

16         **INMATE ELIAS:**  One brother, one sister.

17         **PRESIDING COMMISSIONER ENG:**  I'm sorry.  What

18   was that?

19         **INMATE ELIAS:**  One brother, one sister.

20         **PRESIDING COMMISSIONER ENG:**  Okay.  Older or

21   younger.

22         **INMATE ELIAS:**  Older.

23         **PRESIDING COMMISSIONER ENG:**  Both older?

24         **INMATE ELIAS:**  Yes.

25         **PRESIDING COMMISSIONER ENG:**  Did your older

1    brother, was he in a gang?

2            **INMATE ELIAS:**  No.

3            **PRESIDING COMMISSIONER ENG:**  Did he ever have

4    any problems with law enforcement?

5            **INMATE ELIAS:**  No.

6            **PRESIDING COMMISSIONER ENG:**  How about your

7    sister?

8            **INMATE ELIAS:**  No.

9            **PRESIDING COMMISSIONER ENG:**  So you're the only

10   one that went that route?

11           **INMATE ELIAS:**  Yes.

12           **PRESIDING COMMISSIONER ENG:**  Okay.  So are

13   you -- are you still close with your family?

14           **INMATE ELIAS:**  Yes.

15           **PRESIDING COMMISSIONER ENG:**  And they're still

16   around?

17           **INMATE ELIAS:**  Yes.

18           **PRESIDING COMMISSIONER ENG:**  What about your

19   parents, are they still together?

20           **INMATE ELIAS:**  Yes.

21           **PRESIDING COMMISSIONER ENG:**  Are they alive?

22           **INMATE ELIAS:**  Yes.

23           **PRESIDING COMMISSIONER ENG:**  What did your

24   mother say when you got arrested for this?  What did

25   she say to you?

1          **INMATE ELIAS:**  She was hurt that I could --

2    that I could actually do something like that.

3          **PRESIDING COMMISSIONER ENG:**  You were raised

4    Catholic, weren't you?

5          **INMATE ELIAS:**  Yes.

6          **PRESIDING COMMISSIONER ENG:**  Your family, were

7    they pretty religious?

8          **INMATE ELIAS:**  Yes.

9          **PRESIDING COMMISSIONER ENG:**  So you went to

10   church?  You grew up with the church?

11         **INMATE ELIAS:**  Yes.

12         **PRESIDING COMMISSIONER ENG:**  Do you carry

13   around a lot of that guilt?

14         **INMATE ELIAS:**  Pretty much.

15         **PRESIDING COMMISSIONER ENG:**  Okay.  So you had,

16   like I said, you -- who is the woman -- who is your

17   girlfriend.

18         **INMATE ELIAS:**  Anerica.

19         **PRESIDING COMMISSIONER ENG:**  I'm sorry?

20         **INMATE ELIAS:**  Anerica.

21         **PRESIDING COMMISSIONER ENG:**  Anerica?

22         **INMATE ELIAS:**  Yes.

23         **PRESIDING COMMISSIONER ENG:**  And you had your

24   daughter, correct?

25         **INMATE ELIAS:**  Yes.

1          **PRESIDING COMMISSIONER ENG:**  And how old is

2     your daughter now?

3          **INMATE ELIAS:**  16.

4          **PRESIDING COMMISSIONER ENG:**  It says that you,

5     at the time of this life crime, okay, what the heck

6     were you doing?  You had dropped out of school at 13,

7     so for three years, what were you doing?  You were

8     living at home, correct?

9          **INMATE ELIAS:**  Yes.

10          **PRESIDING COMMISSIONER ENG:**  What were you

11    doing?

12          **INMATE ELIAS:**  Nothing.

13          **PRESIDING COMMISSIONER ENG:**  Nothing.  You

14    weren't working?  You weren't doing anything?  You were

15    just hanging around?

16          **INMATE ELIAS:**  Hanging around the neighborhood.

17          **PRESIDING COMMISSIONER ENG:**  And, again, your

18    parents knew this?

19          **INMATE ELIAS:**  No.

20          **PRESIDING COMMISSIONER ENG:**  They thought you

21    were still in school?

22          **INMATE ELIAS:**  Yes.

23          **PRESIDING COMMISSIONER ENG:**  Okay.  So you were

24    just hanging around.  You were living at home, but then

25    I saw, were you also living with your girlfriend at the

1    same time?  Was she living in your house?

2          **INMATE ELIAS:**  Yes.

3          **PRESIDING COMMISSIONER ENG:**  Because she was

4    pregnant?

5          **INMATE ELIAS:**  Well, she had already had the

6    baby.

7          **PRESIDING COMMISSIONER ENG:**  She had already

8    had the baby.  So --

9          **INMATE ELIAS:**  Well, at that time between 13

10   and 16?

11         **PRESIDING COMMISSIONER ENG:**  Yeah.  When did

12   you hook up with her?

13         **INMATE ELIAS:**  Oh, I met her when I was

14   probably about 14 when I met her.

15         **PRESIDING COMMISSIONER ENG:**  How old was she

16   when she got pregnant?

17         **INMATE ELIAS:**  She was 15.

18         **PRESIDING COMMISSIONER ENG:**  So at that point

19   in time, did she move in with your family until she had

20   the baby, or did she move in with your family after she

21   had the baby?

22         **INMATE ELIAS:**  No.  After she had the baby.

23         **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.  So

24   did she have any idea what you were willing to do?

25         **INMATE ELIAS:**  What I was going to do?

36

1          **PRESIDING COMMISSIONER ENG:**  Yeah, especially

2    after she tells you that she's -- about this attack on

3    her?

4          **INMATE ELIAS:**  No, she didn't know.

5          **PRESIDING COMMISSIONER ENG:**  She had no idea

6    that you were somehow going to take revenge?

7          **INMATE ELIAS:**  No.

8          **PRESIDING COMMISSIONER ENG:**  So are you still

9    with -- I can't pronounce her name.

10          **INMATE ELIAS:**  No, I'm not.

11          **PRESIDING COMMISSIONER ENG:**  You're not with

12    her?

13          **INMATE ELIAS:**  No.

14          **PRESIDING COMMISSIONER ENG:**  Okay.  But you are

15    in touch with your daughter?

16          **INMATE ELIAS:**  Yes.

17          **PRESIDING COMMISSIONER ENG:**  Okay.

18          **INMATE ELIAS:**  I'm in touch with both of them

19    still.

20          **PRESIDING COMMISSIONER ENG:**  Okay.  So, since

21    that time, have you married again or had any other

22    children?

23          **INMATE ELIAS:**  Who?

24          **PRESIDING COMMISSIONER ENG:**  You.

25          **INMATE ELIAS:**  No.

1           **PRESIDING COMMISSIONER ENG:**  Okay.  All right.
2      So have I missed anything regarding your background?
3      How old's your daughter?
4           **INMATE ELIAS:**  16.
5           **PRESIDING COMMISSIONER ENG:**  She's 16.  Do you
6      think about her getting involved with gangs?
7           **INMATE ELIAS:**  I thought about that every day.
8      She's smarter than that.
9           **PRESIDING COMMISSIONER ENG:**  Do you know for
10     sure?
11          **INMATE ELIAS:**  Yes.
12          **PRESIDING COMMISSIONER ENG:**  You talk to her
13     about it?
14          **INMATE ELIAS:**  Yeah.
15          **PRESIDING COMMISSIONER ENG:**  What is it you
16     fear?
17          **INMATE ELIAS:**  What do you mean what I fear?
18          **PRESIDING COMMISSIONER ENG:**  Do you fear that
19     your daughter will associate with gangs?
20          **INMATE ELIAS:**  I feared a lot of things for
21     her, but what I'm saying she's smarter in understanding
22     and realizing that what her father did wasn't right,
23     and she don't want no part of that.
24          **PRESIDING COMMISSIONER ENG:**  How would you feel
25     if you found out that she was part of a gang?

1          **INMATE ELIAS:**  I'd be hurt.  I'd blame myself
2     for it.
3          **PRESIDING COMMISSIONER ENG:**  What would you say
4     to her?
5          **INMATE ELIAS:**  Not to get involved.
6          **PRESIDING COMMISSIONER ENG:**  What if she was
7     standing on the street corner, not part of a gang, and
8     somebody shot her arbitrarily.  She died.  And now
9     you're sitting across the table from the guy that did
10    it.  What would you say to him?  What would you want to
11    say to him?
12         **INMATE ELIAS:**  I don't know.
13         **PRESIDING COMMISSIONER ENG:**  Okay.  Not an easy
14    question, is it?
15         **INMATE ELIAS:**  No.
16         **PRESIDING COMMISSIONER ENG:**  Have I missed
17    anything regarding your social background?
18         **INMATE ELIAS:**  No.
19         **PRESIDING COMMISSIONER ENG:**  Okay.  Let's go
20    ahead and move on.  Commissioner Star's going to bring
21    us up to date with what you've been doing.
22         **DEPUTY COMMISSIONER STAR:**  Okay.  Mr. Elias,
23    I'm going to focus on your post-conviction factors
24    since your last appearance before the Board.  That was
25    on May 19th of '05, your subsequent number one hearing

1    at that time, where you received a two-year denial, and
2    the Board at that time said you need to remain
3    disciplinary free. You need to get self-help. You
4    need to earn positive chronos, and they ordered a new
5    psych evaluation with some focus on your violence
6    potential and the significance to alcohol and drugs.
7    So I'll be reviewing the latest psych report. First,
8    let's start off with your disciplinary and custody
9    status. You are currently classification score of 19,
10   which is the mandatory minimum score. Your custody
11   level is Medium-A. Since your last hearing in '05,
12   you've had no 115's and, in fact, you have been
13   disciplinary free since your life term started. You've
14   had one CDC 128 since your last hearing. It was in
15   2006, and it was for disrespect for staff. Given the
16   recency of that, I'd like you to sort of address that
17   for the Board today. Here you have a pretty good
18   record going in, and then all of a sudden, something
19   like this. Do you want to address it?
20           **INMATE ELIAS:** It was just frustration.
21           **DEPUTY COMMISSIONER STAR:** You weren't by
22   yourself. You were with somebody else too, huh?
23           **INMATE ELIAS:** Yeah. I was the one that said
24   it though.
25           **DEPUTY COMMISSIONER STAR:** You said it? The

1    other guy didn't say anything?

2         **INMATE ELIAS:** No.

3         **DEPUTY COMMISSIONER STAR:** Why were you

4    frustrated?

5         **INMATE ELIAS:** We were just on lock down.  We

6    had been on lock down for a while, you know.  Every

7    time we come off of chow, they kept forgetting about

8    us.  They kept forgetting to pop our door.  And I

9    always had to yell out the cell to get our door open to

10   come out for chow.  And I don't know -- I just -- it

11   was wrong, and I got frustrated.

12        **DEPUTY COMMISSIONER STAR:** Okay.

13        **INMATE ELIAS:** (Inaudible) but they did.  It

14   wasn't the first time.  They kept on doing it to us.

15   So I got a little mad.

16        **DEPUTY COMMISSIONER STAR:** Well, what do you

17   think about that today?  What would you do differently?

18        **INMATE ELIAS:** Keep my mouth shut.

19        **DEPUTY COMMISSIONER STAR:** Were you showing off

20   for the other guy?

21        **INMATE ELIAS:** No.  It wasn't nothing about

22   showing off.  It was just out of frustration.  I mean,

23   I don't know.  Like I said, I was just a little mad.

24        **DEPUTY COMMISSIONER STAR:** Was he your cellee,

25   the other guy?

1              **INMATE ELIAS:**  Yeah.

2              **DEPUTY COMMISSIONER STAR:**  I thought both of

3     you said something.  Let me see.  It says, both inmates

4     informed us they had missed chow released, to which

5     they were released immediately.  Officer Slay and I

6     informed them that they should leave for chow release

7     when instructed by staff.  Both inmates stated that

8     'You cops should fucking do your job, and it's not hard

9     to fucking do it.'  Officer Slay and told them to go to

10    the chow hall so they don't miss their dinner.  Also,

11    both inmates were informed they would receive a 128.

12    But it says both inmates stated.  You didn't hear him?

13             **INMATE ELIAS:**  No.

14             **DEPUTY COMMISSIONER STAR:**  Okay.  Let's move

15    on.  Vocationally, sir, you've completed dry-cleaning,

16    and you're still working in it; is that correct?

17             **INMATE ELIAS:**  Yes.

18             **DEPUTY COMMISSIONER STAR:**  You completed it in

19    '05, the whole course work?  All the courses?

20             **INMATE ELIAS:**  Yes.

21             **DEPUTY COMMISSIONER STAR:**  2005.

22             **INMATE ELIAS:**  Yes.

23             **DEPUTY COMMISSIONER STAR:**  And I did see it.

24    It's just there's a lot of certificates for various

25    aspects of it, so I just always like to make sure what

42

1   year you completed it.  I see certificates, one in 1999

2   for mill and cabinet.  That was just a course.  You did

3   not complete that program?

4       **INMATE ELIAS:**  I didn't complete it.

5       **DEPUTY COMMISSIONER STAR:**  Okay.  I see a

6   certificate in 1999 for refrigeration and air.  Is that

7   the same thing?  Just a course?  And you didn't

8   complete it?

9       **INMATE ELIAS:**  Yeah.  I never got to complete

10  it.

11      **DEPUTY COMMISSIONER STAR:**  Okay.  And there's

12  reference to a certificate.  I didn't see it, but I may

13  have missed it -- in welding.  Did you take a welding

14  course too some.

15      **INMATE ELIAS:**  Yes.

16      **DEPUTY COMMISSIONER STAR:**  What year was that?

17  Do you remember?

18      **INMATE ELIAS:**  That was in in (inaudible) I was

19  in PIA learning a trade.

20      **DEPUTY COMMISSIONER STAR:**  Okay.

21      **INMATE ELIAS:**  2001, I believe.

22      **DEPUTY COMMISSIONER STAR:**  Okay.  So you did

23  complete dry-cleaning.  You're currently working in it.

24  The report refers to some recent chronos, and I don't

25  know if your counselors going to be passing them, but I

43

1   couldn't find them in the report that evaluated your --

2   but I think the psych report referred to some.  I

3   couldn't find them in the Central File, but I'll keep

4   looking, but I did not see any recent supervisor

5   evaluations.  Have you had any recently?

6       **INMATE ELIAS:**  Not recent.  I can't think of

7   any recent once.

8       **DEPUTY COMMISSIONER STAR:**  Okay.  All right.

9   And in terms of self-help, since the last hearing in

10  '05, you've participated in impact.  Are you currently

11  repeating that?  There's four sections to that, isn't

12  there?

13      **INMATE ELIAS:**  There's actually seven.

14      **DEPUTY COMMISSIONER STAR:**  Seven.  And have you

15  completed all seven?

16      **INMATE ELIAS:**  No.

17      **DEPUTY COMMISSIONER STAR:**  Okay.  Which one are

18  you on now?

19      **INMATE ELIAS:**  Well, right now I'm not taking

20  it right now.

21      **DEPUTY COMMISSIONER STAR:**  Okay.  You stopped.

22  When was the last you took it?  Early '06.

23      **INMATE ELIAS:**  Yeah, early '06.

24      **DEPUTY COMMISSIONER STAR:**  And why did you

25  stop?

1          **INMATE ELIAS:**  Well, because they were going

2     back to the beginning.

3          **DEPUTY COMMISSIONER STAR:**  Okay.  So they just

4     automatically decided to go back to the beginning.  I

5     see.  And you started the beginning over again because

6     I saw you in session one all over again in your record.

7     Do you remember that?  Did you repeat session one?

8          **INMATE ELIAS:**  No.

9          **DEPUTY COMMISSIONER STAR:**  No.  Okay.  All

10    right.  So you got through four of those seven sessions

11    in 2005 and early 2006.  You've been doing yoga, and

12    there's a recent certification of that, and it looks

13    like you've been doing that for the last three years

14    maybe?

15         **INMATE ELIAS:**  Yeah.

16         **DEPUTY COMMISSIONER STAR:**  And I see you

17    completed -- or participated in an Overcomers, which is

18    a 12-step program, isn't it?

19         **INMATE ELIAS:**  Yes.

20         **DEPUTY COMMISSIONER STAR:**  Through the church?

21         **INMATE ELIAS:**  Yes.

22         **DEPUTY COMMISSIONER STAR:**  Okay.  And that was

23    in '06?

24         **INMATE ELIAS:**  Yes.

25         **DEPUTY COMMISSIONER STAR:**  Now, are you still

45

1    doing -- besides yoga, are you still doing any of
2    those?

3           **INMATE ELIAS:**  Yeah, the Overcomers.

4           **DEPUTY COMMISSIONER STAR:**  You're still doing
5    the Overcomers.

6           **INMATE ELIAS:**  I stopped for a little bit, but
7    I went back.

8           **DEPUTY COMMISSIONER STAR:**  All right.  I'd like
9    you to tell the Board what you're getting out of
10   Overcomers, why you continue to go to that?

11          **INMATE ELIAS:**  Well, to the truthful, the
12   reason why I stopped is because I felt like, I honestly
13   felt out of place.  I guess I was not making the steps
14   correctly.  I wasn't admitting to them in my everyday
15   life, and I always looked at it as something to do with
16   just alcohol and narcotics, and it's something that is
17   not me.  I don't drink.  I don't do drugs.  That's why
18   I just stopped for a minute.  I just stopped going
19   because I wasn't looking at the steps correctly as I
20   should have.

21          **DEPUTY COMMISSIONER STAR:**  Uh-huh.  And then
22   you started up again?

23          **INMATE ELIAS:**  Yes.  I started going back, and
24   I talked to a few people, and just opening my eyes a
25   little and realizing that it just doesn't have to do

1   with alcohol or narcotics, that you could actually use
2   those steps in different ways.
3          **DEPUTY COMMISSIONER STAR:**  The steps teach
4   you -- have you done all 12?
5          **INMATE ELIAS:**  No.
6          **DEPUTY COMMISSIONER STAR:**  How far have you
7   gotten?
8          **INMATE ELIAS:**  I would say like -- the reason I
9   stopped, because the one right now I'm just working on
10  number four.
11         **DEPUTY COMMISSIONER STAR:**  Okay.  And what's
12  that one?
13         **INMATE ELIAS:**  Make the searching and fearless
14  moral inventory of ourselves.
15         **DEPUTY COMMISSIONER STAR:**  Okay.  And what did
16  that inventory tell you about you and your commitment
17  offense?  Your behavior and the commitment offense?
18         **INMATE ELIAS:**  It just made me realize that a
19  lot.  I realized that -- I don't know, that kid I was
20  then made a terrible mistake.  That's just not me now.
21  I mean, it just opened up my eyes.  I can't change what
22  I did.  I can grow from it.
23         **DEPUTY COMMISSIONER STAR:**  Did it give you any
24  insight as to why you joined up with a gang for
25  protection?

1          **INMATE ELIAS:**  Not really.  I never got into
2    too much depth on that.

3          **DEPUTY COMMISSIONER STAR:**  Have you explored
4    anything about retaliation and what it means and how
5    one would resolve anger?

6          **INMATE ELIAS:**  Well, I guess there's different
7    ways to resolve anger.  One would be just to walk away
8    from it.  That's what I think about, think about what
9    you do before you do it.  Because at that age, I wasn't
10   thinking about any -- I was not thinking about nothing.
11   I wasn't thinking about my actions.  I only think about
12   the consequences.  I wasn't thinking about who was
13   going to get hurt in the process of doing what I'm
14   doing.  All I was thinking about was take action.
15   Taking action that someone's got to pay for something
16   they did, which it was not me, and it was just -- it
17   wasn't right for me to do that because who am I to
18   judge somebody for doing something else.  I'm not the
19   law.  At that time, I was saying, I didn't think a lot.
20   I didn't think about anybody else's feelings but
21   myself.  I did not think about who all was going to get
22   hurt.

23         **PRESIDING COMMISSIONER ENG:**  Let me ask you a
24   question here.  So, what would you do if you're looking
25   down the barrel of a gun and holding that gun is a

1   16-year-old gang member with the same thought process

2   that you had back then.  What have you learned?  How

3   would you -- could you even get through to him so that

4   he wouldn't pull that trigger and shoot you because of

5   what was in his head and what he thought?

6   **INMATE ELIAS:**  Everything that I did, I was

7   thinking about trying to get through to somebody.

8   **PRESIDING COMMISSIONER ENG:**  But if you're

9   standing there and this kid's holding a gun on you and

10  he thinks that you're a bad guy and he just doesn't

11  know you but just wants to blow you away just for the

12  heck of it, and you're looking down that barrel of a

13  gun, a kid half your age, what would you do?

14  **INMATE ELIAS:**  Do my best to talk to him, make

15  him realize he's not making the right decision, you

16  know, to think about, concentrate on what is going to

17  happen after I pulls that trigger, and think about what

18  he's going to hurt in the process by doing what he's

19  going to do because it ain't just about me dying.  It

20  ain't just about him pulling the trigger.

21  **PRESIDING COMMISSIONER ENG:**  Well, when you

22  were that 16-year-old kid with that gun, would you have

23  listened?

24  **INMATE ELIAS:**  I don't know.

25  **PRESIDING COMMISSIONER ENG:**  When you're doing

1    an inventory of yourself, sir, you need to be looking

2    as to factors as to why you joined a gang, why you

3    needed protection, maybe your self-image, whether

4    you're a follower.  Those are all inventories of

5    characteristics of yourself that you need to take and

6    examine, think, deeply, because of the nature of the

7    crime we have.

8         **DEPUTY COMMISSIONER STAR:**  I'm going to move on

9    then.  I didn't see any laudatory chronos or others to

10   mention here.  If I missed anything, I do want you,

11   sir, to speak up and make sure.

12        **PRESIDING COMMISSIONER ENG:**  You don't have any

13   in your packet?  Because a lot of times inmates will

14   bring them in because they haven't been able to get

15   into the C-File, sir.  You did a C-File review back in

16   April?

17        **INMATE ELIAS:**  Yes.

18        **PRESIDING COMMISSIONER ENG:**  So between April

19   and today, did you get any chronos?

20        **INMATE ELIAS:**  No.  The ones that I had should

21   be in there.

22        **PRESIDING COMMISSIONER ENG:**  Okay.

23        **ATTORNEY STRINGER:**  I'm going to submit this

24   anyway because there are some '07 and '06 chronos.

25        **DEPUTY COMMISSIONER STAR:**  And I didn't see

1   them, but the doctor mentioned them, but I was

2   concerned.  Let me do a quick review, particularly

3   there's several old ones, but I'm going to do the more

4   recent once.  And I didn't mention this, I don't think.

5   You are enrolled in college, sir, right?

6           **INMATE ELIAS:**  Yeah.

7           **DEPUTY COMMISSIONER STAR:**  You got your GED in

8   1994?

9           **INMATE ELIAS:**  Yes.

10          **DEPUTY COMMISSIONER STAR:**  Which is a

11  significant accomplishment, and I commend you on that,

12  and now you've enrolled in college, and I showed a

13  couple of courses you've taken, Algebra and a dramatic

14  arts course.

15          **INMATE ELIAS:**  Yes.

16          **DEPUTY COMMISSIONER STAR:**  Any others?

17          **INMATE ELIAS:**  Not the recent ones.  The ones I

18  took before.

19          **DEPUTY COMMISSIONER STAR:**  Okay.  Do you have

20  an educational goal?  Are you trying to get to your AA

21  degree or --

22          **INMATE ELIAS:**  I'm trying to get it.  It's not

23  easy.

24          **DEPUTY COMMISSIONER STAR:**  Why do you mean

25  that?  How do you mean by that?

1          **INMATE ELIAS:** I guess I struggle in a few
2     courses.

3          **DEPUTY COMMISSIONER STAR:** Uh-huh.  And this is
4     also what I was looking at is, I think you need to keep
5     trying.  I think it's good that you're trying, and you
6     shouldn't let yourself lose faith in that.  You've made
7     significant accomplishments, and I don't want you -- to
8     get your GED and then start enrolling in college
9     courses with an eighth-grade education is significant.
10    Okay.  And these are significant.  Thank you,
11    Mr. Stringer.  These were the updated education
12    progress reports that I was looking for on his
13    dry-cleaning that weren't in the file, and the reason
14    I'm saying this is you do need -- these are originals,
15    and you do need to make sure that you give them to the
16    counselor to get them eventually in your file.  Okay.

17         **INMATE ELIAS:** I thought it had those.

18         **DEPUTY COMMISSIONER STAR:** Yeah.  I did not see
19    them in there.  Maybe they haven't caught up.  I'm just
20    letting you know.  And this is a December 31st, '06,
21    128E, education progress report as well as a March
22    31st, '07 education progress report showing
23    satisfactory performance on both quarters in his course
24    work in dry-cleaning.  And that's pertinent, sir, so we
25    do have updated.  And I think other than the education

52

```
 1    one, I think I've covered everything else in this
 2    package, particularly about IMPACT. Oh, this is new --
 3    no. That's the education. I'm sorry. It's
 4    repetitive, algebra and dramatic arts course. Okay. I
 5    think I've covered all the others. I want to hand
 6    these back to you. Let's move on to the psychological
 7    evaluation. At the last Board hearing, they asked
 8    the -- for a new psych report to specifically address a
 9    couple of issues. And I'm referring now to a psych
10    report prepared for today's hearing by Dr. Richard
11    Starrett, S-T-A-R-R-E-T-T, Ph.D., clinical
12    psychologist, and he completed this report on April
13    20th, 2007, for the Board, and he was asked to address
14    a couple of issues, questions proposed by the Board at
15    the 2005 hearing, which is the prisoner's violence
16    potential in the free community, and the significance
17    of alcohol and drugs as it relates to the commitment
18    offense and an estimate of the prisoner's ability to
19    refrain from the use, abuse of same when released.
20    Let's start with -- he reviews a lot of factors we've
21    already talked about, programming, and release plans,
22    and he speaks about the motivation, understanding the
23    life crime on Page 4 of his report, and you stated to
24    him, at the time you did this shooting, 'I was shooting
25    the person, I was shooting the person who actually
```

1     tried to hurt my daughter's mother.' Do you believe

2     this in your mind, sir? That even though you did not

3     know this person?

4             **INMATE ELIAS:** I didn't see the (inaudible)

5     that I was actually looking for.

6             **DEPUTY COMMISSIONER STAR:** So had you cruised

7     the neighborhood before this shooting?

8             **INMATE ELIAS:** No.

9             **DEPUTY COMMISSIONER STAR:** Had you been out the

10    night before looking for this person?

11            **INMATE ELIAS:** No.

12            **DEPUTY COMMISSIONER STAR:** He also -- you told

13    the doctor that you had had -- had you bought the gun

14    on the streets and had it for a year but never used.

15    Is that accurate?

16            **INMATE ELIAS:** Yeah.

17            **DEPUTY COMMISSIONER STAR:** So had you never

18    shot that gun before?

19            **INMATE ELIAS:** No. I had shot it before. I

20    never had used it against somebody else.

21            **DEPUTY COMMISSIONER STAR:** So you did what?

22    Target practice, you mean?

23            **INMATE ELIAS:** No. I just shot it, make sure

24    if it works.

25            **DEPUTY COMMISSIONER STAR:** Had you carried it

1   out on the streets with your friends?

2            **INMATE ELIAS:**  Yes.

3            **DEPUTY COMMISSIONER STAR:**  Had you used it in

4   any other shootings with gang friends?

5            **INMATE ELIAS:**  No.

6            **DEPUTY COMMISSIONER STAR:**  Okay.  Let's move

7   on.  He does a diagnostic impression on Page 5.  He

8   rules out, I guess, an earlier diagnosis from a 2002

9   evaluation.  At that time, there was a diagnosis of

10  oppositional conduct disorder by history and

11  anti-social personality.  Dr. Starrett says, in his

12  2007 evaluation that he's ruling those out.  He's

13  ruling oppositional defiant disorder versus conduct

14  disorder, adolescent onset as moderate rule out.  I'm

15  not really clear what he's trying to say.  Let's see.

16  He says:

17            "A mental health evaluation dated April

18            1, 2005, diagnosed the inmate with

19            oppositional conduct disorder by history.

20            Regarding the inmate's dangerousness, the

21            author concludes previous history of

22            violence is never above the inmate's

23            prior history of violence, places in the

24            greater risk for future violence than

25            persons with no such history.  The lack

1    perspective and said it was low, and then he looked at

2    it from the risk management perspective and said it was

3    low and concluded the propensity for future violence is

4    in the low range.  I want to go back, though, and we

5    have his assessment, and read what he wrote on clinical

6    insight because I think it's important, particularly,

7    having some statements you've made today:  "The inmate

8    would rate low on this," I'm reading towards the bottom

9    of Page 6 under clinical insight:

10          "The inmate would rate low on this

11          factor.  The inmate does not have a

12          negative attitude, no active mental

13          health symptoms and is no longer

14          impulsive.  The inmate has a slight

15          elevation on response to treatment and

16          less serious elevation on response to

17          treatment and insight factor.  The inmate

18          has begun to program, beginning in the

19          early 2000's and needs to continue along

20          this path.  The inmate understands many

21          of the factors on the surface that

22          contributed to his crime a little more

23          in-depth into the underlying issues and

24          how he has dealt with them would be

25          appropriate."

1           of a relationship between the inmate and
2           the victim suggests a random nature to
3           his violent act, which may increase risk
4           of dangerousness."

5           And then he says:  "A mental health evaluation
6    on June 19th, 2002, diagnosed the inmate with
7    oppositional conduct disorder by history and
8    anti-social personality.  No risk assessment is
9    conducted."  The author concludes:  "It is his opinion
10   to a reasonable degree of medical probability that the
11   inmate is currently at a moderate risk."  So these are
12   summaries of other two assessments that were done prior
13   to the 2007, and it appears that Dr. Starrett, from my
14   best interpretation of this, is ruling out those
15   diagnoses.  Axis II is no diagnosis.  Axis III is none.
16   Axis IV is incarceration for life-term and his Axis V
17   GAF score is 80, which is pretty good.  Then we get
18   into the risk assessment, and he uses three different
19   scales, the PCL-R, which is based on records review and
20   an interview, and it addresses any level of
21   psychopathy, and he says it's low for Mr. Elias.  The
22   HCR-20, which is also based on records and an interview
23   and its an assessment of risk for future violence.  He
24   looked at it from a historical perspective and said it
25   was low.  He looked at it from the clinical insight

```
 1            And that's getting to what I was asking you
 2       about, sir, which is, I think, what is the application
 3       of some of the self-help to understanding your
 4       commitment offense, and I note the doctor feels a
 5       little more insight, you would benefit from that.  And
 6       then the last factor, or scale he rates you on is
 7       called the LS/CMI, which is an assessment of
 8       recidivism, and he also says your general level of
 9       recidivism is low what compared to similar inmates, and
10       the overall risk assessment is summarized as being low
11       on psychopathy, propensity for future violence, low
12       range, inmate's general level of recidivism to repeat
13       it all is low.  Then the second question the Board
14       asked him to review is the significant of alcohol and
15       drugs.  And he writes:
16            "There is no relationship between alcohol
17            and drugs in the committed offense.  The
18            inmate began experimented with alcohol
19            and marijuana around the age of 15.  The
20            inmate only occasionally drank.  He never
21            drank more than five or six beers."
22            I wonder if that means at one time.
23            "He has been drunk a total of three time.
24            He never got into trouble or arrested
25            while drinking.  This is confirmed by the
```

| | |
|---|---|
| 1 | record, and alcohol was not involved in |
| 2 | this case.  The inmate has been clean and |
| 3 | sober for 15 years.  He has been involved |
| 4 | in AA now for three years.  He has not |
| 5 | worked the steps as yet.  He does not see |
| 6 | the life-long need for treatment.  As a |
| 7 | precaution, it is recommended that the |
| 8 | inmate continue in AA treatment and that |
| 9 | he works the steps as a model for future |
| 10 | life style." |
| 11 | Okay.  Did you read the doctor's report, sir? |
| 12 | **INMATE ELIAS:**  Yes. |
| 13 | **DEPUTY COMMISSIONER STAR:**  Yourself?  Did you |
| 14 | have anything you wanted to comment on?  I've |
| 15 | highlighted a few things of what he said. |
| 16 | **INMATE ELIAS:**  No. |
| 17 | **ATTORNEY STRINGER:**  I would like to comment |
| 18 | that I don't believe my client or I know what |
| 19 | oppositional disorder is or what it means, so I think |
| 20 | that's meaningless in this particular proceeding. |
| 21 | **DEPUTY COMMISSIONER STAR:**  Well, I was going to |
| 22 | try to examine this, apparently, in the 2005 report, so |
| 23 | I'm not sure it's going to add much clarity, so I'm not |
| 24 | sure I'm going to do that at this time.  The 2005 |
| 25 | report, which was prepared by an MD doctor, a |

1    Dr. Kornberg, with a K, K-O-R-N-B-E-R-G, well, felt --
2    he felt that the prior history of violence put him at
3    risk and the random nature of the violent act also
4    increases his dangerousness, and he also concluded no,
5    no role -- substance abuse played no role, but feels he
6    needs to stay away from alcohol nonetheless.  Okay.
7    I'll go ahead, then, and return this back to the
8    Commissioner Eng.  Go ahead.

9         **PRESIDING COMMISSIONER ENG:**  Okay.  Mr. Elias,
10   let's talk about your future plans.  Okay.  I see
11   according to this August 2007 Board report and also
12   after reviewing all these letters, that you do have
13   pretty extensive family support out there.  So, what is
14   your number one choice for where you would reside?

15        **INMATE ELIAS:**  My number one choice?

16        **PRESIDING COMMISSIONER ENG:**  Uh-huh.  Quick.

17        **INMATE ELIAS:**  Seeing as I would have to be
18   paroled back to Oakland, back to Alameda County again,
19   it's going to have to be back with my mom.

20        **PRESIDING COMMISSIONER ENG:**  If you did not
21   have to, where would you feel you would have the best
22   chances of success?

23        **INMATE ELIAS:**  My brother.

24        **PRESIDING COMMISSIONER ENG:**  Where is your
25   brother?

1          **INMATE ELIAS:**  Stockton.

2          **PRESIDING COMMISSIONER ENG:**  In Stockton.

3     Okay.  Why?

4          **INMATE ELIAS:**  It just gets me out of Oakland.

5          **PRESIDING COMMISSIONER ENG:**  Is that because

6     there's still people in both those gangs that are still

7     running around the streets?

8          **INMATE ELIAS:**  Not necessarily, ma'am.  It's

9     just honestly looking at something new as an area, and

10    Oakland is not a good place.

11         **PRESIDING COMMISSIONER ENG:**  This is true.

12    There have been a lot of shootings lately.  So, your

13    first choice would really be your brother's in

14    Stockton.

15         **INMATE ELIAS:**  Yeah.

16         **PRESIDING COMMISSIONER ENG:**  Your daughter,

17    however, lives with your parents.

18         **INMATE ELIAS:**  That's why I said I would rather

19    go with my mom because I would never be with my

20    daughter.

21         **PRESIDING COMMISSIONER ENG:**  Where is your

22    mother now?

23         **INMATE ELIAS:**  Excuse me?

24         **PRESIDING COMMISSIONER ENG:**  Where is the

25    mother of the child?

61

1          **INMATE ELIAS:**  She stays in Fremont.

2          **PRESIDING COMMISSIONER ENG:**  How come your

3     parents have custody?

4          **INMATE ELIAS:**  She went through some ups and

5     downs, so --

6          **PRESIDING COMMISSIONER ENG:**  I'm sorry.  She

7     what?

8          **INMATE ELIAS:**  I said she went through some ups

9     and downs when she was younger, so my parents took

10    custody of my daughter.  They've had custody over all

11    this time.

12         **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.

13    Well, let's go through some of these letters then.

14    Okay.  And you tell me in general if it's something

15    you're seriously considering or not.  We got a letter

16    from Michelle Rodriguez, your cousin?

17         **INMATE ELIAS:**  Yeah.

18         **PRESIDING COMMISSIONER ENG:**  Who also lives in

19    Oakland?

20         **INMATE ELIAS:**  Yes.

21         **PRESIDING COMMISSIONER ENG:**  And in general,

22    she states that would you have a place to stay, a

23    vehicle to get to and from work and financial

24    assistance until you're stable, and she says that I

25    welcome my cousin into my home where I reside with my

62

1    two children, but she says that you would be assisting
2    her with her children while she attends school in the
3    evenings.  I guess you would be a baby sitter?
4         **INMATE ELIAS:**  Yes.
5         **PRESIDING COMMISSIONER ENG:**  Which is nice, but
6    is this something that you would seriously consider in
7    all honesty?
8         **INMATE ELIAS:**  No.  We talk about it before and
9    if I do get out, I mean, I want to help all my family
10   do what I can.  They've been here for me all this time.
11   I want to try to help them in any which way that I can.
12        **PRESIDING COMMISSIONER ENG:**  Okay.  Do you
13   think you're being realistic about that?
14        **INMATE ELIAS:**  No.  I mean, I'm not saying that
15   I would take care of a kid like be a baby sitter, but
16   I'm not going to say that I would not take care of her
17   kids sometimes because I would, you know.
18        **PRESIDING COMMISSIONER ENG:**  What do you think
19   you will need, not just to survive, once you -- if and
20   when you walk through those gates.  What do you think
21   you will need to really succeed?
22        **INMATE ELIAS:**  A job.
23        **PRESIDING COMMISSIONER ENG:**  Uh-huh.  Doing
24   what?  If you could have your wish, what would you be
25   doing?

63

1          **INMATE ELIAS:**  If I was granting my wish.

2          **PRESIDING COMMISSIONER ENG:**  Yeah.

3          **INMATE ELIAS:**  It would be graphics.

4          **PRESIDING COMMISSIONER ENG:**  It would be what?

5          **INMATE ELIAS:**  Computer graphics.

6          **PRESIDING COMMISSIONER ENG:**  Computer graphics.

7     Okay.  What in computer graphics?

8          **INMATE ELIAS:**  I would like to get into, like,

9     to doing like (inaudible) and stuff.

10         **PRESIDING COMMISSIONER ENG:**  Are you talking

11    about games?  Are you talking about advertising?  What

12    are you talking about?

13         **INMATE ELIAS:**  Like videos, video games and

14    movies, stuff like that.

15         **PRESIDING COMMISSIONER ENG:**  Have you taken any

16    courses in that?

17         **INMATE ELIAS:**  No.

18         **PRESIDING COMMISSIONER ENG:**  Do you know if you

19    have any talent for that yet?

20         **INMATE ELIAS:**  Well, I like to draw.

21         **PRESIDING COMMISSIONER ENG:**  Pardon me?

22         **INMATE ELIAS:**  I said I do like to draw.

23         **PRESIDING COMMISSIONER ENG:**  Okay.

24         **INMATE ELIAS:**  And courses, there are not any

25    courses here.

64

1        **PRESIDING COMMISSIONER ENG:**  Does not mean you
2    can't look outside as to what you might be able to do
3    in other courses.  You know, you're in a perfect place,
4    San Quentin, for some reason, inmates have access to a
5    lot more things than any other prisoners at any other
6    institutions in the state.  So, one can never tell.
7    But, I'm just asking you this because you were 16 when
8    you came in.  You were a kid.  Okay.  You've never been
9    on your own.  You've never really worked out there.
10   You've never really been on your own, so what do you
11   think that you're going to need?  You know, and how
12   long do you think you're going to need help in terms of
13   transitioning back into the real world out there?  I
14   don't expect an answer right now.  I just want you to
15   think about that because it's a tough -- it's a tough
16   transition even if you had come into an institution as
17   an adult and you'd been incarcerated for, you know, 20
18   years or something.  It's a rude awakening to walk back
19   out.  Let's keep going through these letters.  Olga
20   Martel in Southgate, California.  I know that these are
21   pretty current even though a lot of these don't have
22   any dates, but they came in the updated material.  Olga
23   is your sister?

24       **INMATE ELIAS:**  Yes.

25       **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

1   She's married and has two boys.  She states her home
2   will always be open to you emotionally and financially.
3   Okay.  Domingo and Norma Elias, these are your parents?
4            **INMATE ELIAS:**  Yes.

5            **PRESIDING COMMISSIONER ENG:**  Okay.  Who live in
6   Oakland.  And, again, they state that as his parents,
7   we are definitely willing to accept Osvaldo back into
8   our home.  That's where they state that you have a
9   16-year-old daughter, who they currently have custody
10  of, so it would be a joy to have you back there.  So,
11  obviously, they would provide you with anything that
12  you would need to come back home.  Valerie Elias.
13  Valerie is married to your brother --

14           **INMATE ELIAS:**  Rogelio.

15           **PRESIDING COMMISSIONER ENG:**  Rogelio.  See, I
16  was going to say Rogelio.  I apologize up front.
17  Everybody's laughing.  You're saying no.  I can destroy
18  Spanish.  It's Rogelio Elias, and she states that if
19  you're able to get a parole date, you can have a home
20  to live at with them.  Okay.  She says I have a job as
21  a janitor at my place of business that he can work at.
22  What's her business?

23           **INMATE ELIAS:**  Who's?

24           **PRESIDING COMMISSIONER ENG:**  Valerie's
25  business?

1        **INMATE ELIAS:**  She works at a dental office.

2        **PRESIDING COMMISSIONER ENG:**  So she's stating

3    that they need a janitor where they works; is that what

4    that means?

5        **INMATE ELIAS:**  Yes.

6        **PRESIDING COMMISSIONER ENG:**  It's a little

7    vague.  So that's why I was just wondering.  Is that a

8    job offer or not a job offer?

9        **INMATE ELIAS:**  Well, honestly, I never really

10   talk to her about that.

11       **PRESIDING COMMISSIONER ENG:**  Okay.  So we went

12   even go there, and this is from your brother Rogelio.

13       **INMATE ELIAS:**  Yeah.

14       **PRESIDING COMMISSIONER ENG:**  July 16th, 2007,

15   and he also states that he's your older brother and

16   that you have a home with his family when you're

17   paroled.  This is the brother you're talking about in

18   Stockton?

19       **INMATE ELIAS:**  Yeah.

20       **PRESIDING COMMISSIONER ENG:**  This is the one

21   that you would prefer to live with.  Do they have

22   children?

23       **INMATE ELIAS:**  Yeah.

24       **PRESIDING COMMISSIONER ENG:**  Or is it

25   just -- how many kids?

67

1              **INMATE ELIAS:**  They have two girls.

2              **PRESIDING COMMISSIONER ENG:**  Two girls.  How

3     big is the house?

4              **INMATE ELIAS:**  He bought it a few years back.

5              **PRESIDING COMMISSIONER ENG:**  Would you be on

6     the couch, or would you have your own room?

7              **INMATE ELIAS:**  No.  I'd have my own room.

8              **PRESIDING COMMISSIONER ENG:**  Okay.  Elvira

9     Rodriguez in Oakland, your grandmother.

10             **INMATE ELIAS:**  My grandma.

11             **PRESIDING COMMISSIONER ENG:**  Okay.

12             **INMATE ELIAS:**  She says I offer him my home as

13    well as financial and emotional support to start his

14    new life.  Does she live close to your parents?

15             **INMATE ELIAS:**  Yes.

16             **PRESIDING COMMISSIONER ENG:**  Okay.  So those

17    are all the ones that we have for residential.  Then,

18    in terms of employment, July 28th, 2007, from Marciel

19    Garcia, owner of Garcia's Tire and Brakes in Oakland.

20    Marciel states that I endorse in helping his son, I

21    guess this is your father.

22             **INMATE ELIAS:**  Yes.

23             **PRESIDING COMMISSIONER ENG:**  Domingo, okay.

24    Find employment, recommend him for employment or

25    provide employment.  Is this a viable option for you?

1        **INMATE ELIAS:** Is it a viable option?

2        **PRESIDING COMMISSIONER ENG:** I don't get this

3    as a real strong we're offering you a job and doing X,

4    Y, Z. It says that I endorse helping Domingo's son

5    find employment or recommend him for employment and

6    lastly or provide employment. Do you see what I'm

7    saying?

8        **INMATE ELIAS:** It's not a job that I would

9    actually --

10       **PRESIDING COMMISSIONER ENG:** Consider?

11       **INMATE ELIAS:** -- consider.

12       **PRESIDING COMMISSIONER ENG:** All right. That's

13   what I'm getting at. We've got -- I can't pronounce --

14   Otaez Mexican restaurant.

15       **INMATE ELIAS:** Otaez.

16       **PRESIDING COMMISSIONER ENG:** Otaez Mexican

17   restaurant, July 27th, 2007. These folks, Jesus and

18   Socorro Campos, I'm assuming own?

19       **INMATE ELIAS:** Yes.

20       **PRESIDING COMMISSIONER ENG:** They've known your

21   grandparents for the last 20 years, and I thought I

22   read in this letter that they own a couple. Well, they

23   own two very well known restaurants that serve the

24   Oakland community, and they are supportive in assisting

25   you with employment in our business. So, I don't know

69

 1    as what or what hours or anything, but, it's, I guess,

 2    something you can fall back on.  Then we've got a

 3    hand-written letter from Mario Rodriguez who also lives

 4    in Oakland.  Is this -- oh, an uncle.

 5            **INMATE ELIAS:**  An uncle, yeah.

 6            **PRESIDING COMMISSIONER ENG:**  Okay.  And he's

 7    been in the roofing field for 40 years and says that he

 8    can teach you the skills required to become employed in

 9    this field.  How old is your uncle?

10            **INMATE ELIAS:**  He's 50.

11            **PRESIDING COMMISSIONER ENG:**  Okay.  So he's

12    still active in the roofing business?

13            **INMATE ELIAS:**  Yes.

14            **PRESIDING COMMISSIONER ENG:**  Okay.  Is that

15    something that you'd be interested in doing?

16            **INMATE ELIAS:**  Yes.

17            **PRESIDING COMMISSIONER ENG:**  You've got a

18    letter from Veronica Perez in Hayward, California, your

19    cousin.  She states that her fiancé, Miguel Loya is

20    owner and partner of a gardening and landscaping

21    business and can provide you with employment, stable

22    income, and new job skills.  Okay.  Again, this is your

23    cousin.  So, is this -- do you know Miguel?

24            **INMATE ELIAS:**  Well, I don't know him

25    personally, but I've talked to him.

70

1              **PRESIDING COMMISSIONER ENG:**  Okay.  And just

2      generally speaking, letters offering employment

3      generally should come from a person that is in the

4      position to hire and fire.  Okay.  And should have an

5      address and telephone number and if they are a

6      contractor, what type of license they have, and should

7      provide enough detail to state that they are offering a

8      job as, like, landscape architect to you, and this is

9      full-time, which equates to 40 to 60 hour a week,

10     Monday through Friday with benefits, whatever.  You

11     know, but more detail so you would have some idea as to

12     what they would expect you to do because if they're

13     offering you a job as a landscape architect, I would be

14     saying, well, do you have the capability to be a

15     landscape architect.  So, at least have some idea as to

16     what they would be expecting or if they want you to be,

17     you know, the guy who is going to water all the plants

18     and there's going to pay you $5 on hour.  I'm just

19     going to extremes, just some sort of guideline so that

20     you have a better idea as to what people will expect

21     and that it's in writing because people can say all

22     they want, but when push comes to shove, if you need to

23     depend on a job to get a job out there, are these

24     people going to come through and at what amount?  Are

25     you going to have to work three different jobs just to

1   be able to get money for gas. So these are just things
2   I'm trying to throw out to you. See, when somebody's
3   offering a job, see, this letter, I wouldn't consider
4   it seriously because your cousin doesn't own the
5   company, but she's stating for somebody else, her
6   fiancé. We don't know how viable that company is. Can
7   he even afford to hire you. Is that going to be
8   viable? Does that make sense to you so far?
9           **INMATE ELIAS:** Yeah.
10          **PRESIDING COMMISSIONER ENG:** So any
11  documentation that you provide to the Panel, should be
12  able to withstand an investigation, so think about it
13  in those terms, okay, that it's got to withstand an
14  investigation because people will go out and
15  investigate to see if this is true and if it is a fit
16  and if there are any problems, et cetera. Okay. All
17  right. Oftentimes, having a few really, really solid
18  offers then inundating the Panel with a whole bunch of
19  letters that we're not sure of what they're really
20  saying, so I want you to think about that first. But
21  it's nice because what this shows is that you've got a
22  lot of family support. Okay. Webber's Quality Meats,
23  July 24th, 2007, from Angelica Morte. Morte or Mort?
24          **INMATE ELIAS:** Morte.
25          **PRESIDING COMMISSIONER ENG:** And it says

```
 1    Domingo, I guess your father has been employed with
 2    Webber's Quality Meats since 1990 and because the
 3    dedication the Elias family has shown the staff at
 4    Webber's Quality Meats in supporting and assisting
 5    Osvaldo Videl Elias in his search for employment,
 6    providing employment or a recommendation for
 7    employment.  Okay.  So, again, do you have any idea
 8    what you might do for Webber's Quality Meats.
 9         INMATE ELIAS:  (Inaudible) my dad.
10         PRESIDING COMMISSIONER ENG:  So you're not sure
11    what they would expect?
12         INMATE ELIAS:  Well, I would know what they
13    would expect because he began as a janitor.
14         PRESIDING COMMISSIONER ENG:  Okay.  Okay.  But
15    that's -- your father went to try to get these letters,
16    so I think that speaks a lot.  Okay.  Then we have a
17    lot of general support letters, again from Erica
18    Barrera, B-A-R-R-E-R-A, in Oakland.  Is this an old
19    family friend?
20         INMATE ELIAS:  Yes.
21         PRESIDING COMMISSIONER ENG:  Okay.  General
22    support letter.  Leticia Elias in Oakland -- this is
23    your daughter?
24         INMATE ELIAS:  My daughter.
25         PRESIDING COMMISSIONER ENG:  This is your
```

1    daughter.  No date, and it's not signed, but another

2    general support letter.  Okay.  It says, I need my dad.

3    Angelica Munoz -- I mispronounced that one.

4            **INMATE ELIAS:**  Munoz.

5            **PRESIDING COMMISSIONER ENG:**  Munoz, in Fremont.

6    Known you for 18 years.  Oh, this was -- this is the

7    mother of your child?

8            **INMATE ELIAS:**  Yes.

9            **PRESIDING COMMISSIONER ENG:**  Okay.  So you said

10   that she's if Fremont, but at least she's writing you a

11   support letter.  She's a counselor for criminal justice

12   for the Latino Commission in Oakland?

13           **INMATE ELIAS:**  Yes.

14           **PRESIDING COMMISSIONER ENG:**  Okay.  Raphael and

15   Marta Elias in San Lorenzo, California, aunt and uncle,

16   a general support letter.  Manuel Arias in Oakland,

17   California, July 15th, 2007.  They've known -- okay.

18   They've known your family for more than 20 years?

19           **INMATE ELIAS:**  Yeah.

20           **PRESIDING COMMISSIONER ENG:**  All right.  So

21   that's another family friend, long-time family friend,

22   general support.  Michaela Maldonado in Oakland, July

23   15th, 2007, cousin.  It says I have a son and daughter

24   of my own, and I know how important it is to have a

25   father in a child's life as they grow up.  So a general

1    support letter.  Antonio and Anna Perez in Oakland,

2    July 16th, 2007, aunt and uncle, another aunt and

3    uncle, general support.  Esperanza Ezzazava?

4         **INMATE ELIAS:**  Yeah.

5         **PRESIDING COMMISSIONER ENG:**  Did I say that

6    correctly?  Sort of?  Sorry.  In Oakland, July 16th,

7    2007, cousin.

8         **INMATE ELIAS:**  Yeah.

9         **PRESIDING COMMISSIONER ENG:**  It states I'm the

10   mother of a teenage boy and a baby girl.  Okay.

11   Another general support letter.  Okay.  Those are the

12   ones that I have that Mr. Stringer so nicely separated

13   out into three categories so I didn't have to go

14   through all of these myself.  Did I miss anything?

15        **INMATE ELIAS:**  That's all of them.

16        **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.

17   Okay.  Well, sir, we also, again, it's nice to see that

18   you've got such widespread family support.  If you were

19   to go to Stockton, where would you work?

20        **INMATE ELIAS:**  Where would I work?

21        **PRESIDING COMMISSIONER ENG:**  Yeah.

22        **INMATE ELIAS:**  Well, I would begin where my

23   sister-in-law said as a janitor until I get settled.

24        **PRESIDING COMMISSIONER ENG:**  Oh.  At her dental

25   office.

75

1          **INMATE ELIAS:**  Yeah.

2          **PRESIDING COMMISSIONER ENG:**  Okay.  So we also

3    send out Penal Code Section 3042 notices.  Those

4    notices go to agencies or individuals that have a

5    direct interest in your case.  I don't believe we're in

6    receipt of any letters from law enforcement, correct?

7          **DEPUTY COMMISSIONER STAR:**  We have a DA's

8    letter.

9          **PRESIDING COMMISSIONER ENG:**  I do have the

10   letter from District Attorney's office.  Okay.  This is

11   dated July 26th, 2007, and I haven't looked at it.

12   From Thomas Orloff, O-R-L-O-F-F signed by, it looks

13   like Jeffrey Stark, Senior Deputy District Attorney.

14   Basically it states:  "I wrote to oppose Elias's

15   application for parole."  It goes on to state about

16   this hearing today, and that you pled guilty on March

17   12th, 1997.  Oh.  Mr. Stark was the trial prosecutor.

18   He has written letters opposing Elias's prior

19   applications for parole in 2002 and 2005.  He's

20   attached those letters and asks that they be considered

21   along with this letter.  And he states that:

22              "As my earlier letters documented, Elias

23              was heavily involved in a gang war

24              between Norteno and Sureno street gangs

25              in Oakland, during the two years leading

```
1            up to the commitment murder, and Elias
2            has first denied that he minimized his
3            gang involvement. We strongly believe
4            that until Elias acknowledges his full
5            involvement in gang violence and accepts
6            responsibility for his violent conduct,
7            he remains a danger to the community if
8            released. He states that he's only
9            recently admitted gang membership to
10           mental health evaluators or CDC
11           personnel, that he was motivate today
12           shoot and kill 14-year-old Aldo Espinoza
13           by a desire to take revenge for an
14           earlier assault committed by a member,"
15           et cetera.
16           Okay.
17           "Elias has not admitted the nature of his
18           gang involvement at the time the murdered
19           Mr. Espinoza. Instead, he continues to
20           downplay his gang involvement and his
21           personal involvement in a gang war that
22           involved multiple shootings and at least
23           one other murder, that of Toby Rego in
24           front of Elias's parents house. Elias
25           was the target of that murder. We
```

1          continue to emphasize Elias's involvement

2          in gang violence because he fails to

3          acknowledge it himself.  We believe

4          strongly that as long as Elias continues

5          to minimize his early involvement in gang

6          violence, he will avoid accepting

7          responsibility for the full extent of his

8          acts and involvement in violence.  Until

9          such time as Elias can admit and accept

10         responsibility for his complete and total

11         embrace of the violent gang culture, he

12         remains a high risk to the community.  We

13         base that assessment on all the facts

14         related to his commitment offense and his

15         heavy involvement in the violent gang war

16         that preceded his murder of Mr. Espinoza.

17         We note also Elias's many years of denial

18         of gang membership."

19         It states further:

20         "We think it far more likely that Elias

21         chose not to admit gang membership until

22         recently to minimize his own culpability

23         and increase the likelihood he would be

24         released on parole rather than his desire

25         to shield his family from additional

```
 1            embarrassment.  Elias's family has
 2            provided -- always provided him with
 3            support including when he left school at
 4            age 13 and when he committed himself
 5            fully to the gang life style.  Toby Rego
 6            was standing in front of the Elias family
 7            house when he was shot and killed.
 8            Elias's family could not have helped but
 9            be aware that he associated exclusively
10            with gang members and that he did not
11            work or attend school.  A parole plan
12            that includes Elias returning to the
13            family house where his gang activities
14            were subsidized only increases the
15            potential danger he poses to our
16            community.  Accordingly, we respectfully
17            request his application for release on
18            parole be denied, and we believe he
19            represents a substantial danger to the
20            community if released.  In addition, we
21            respectfully request that if the Board of
22            Prison Terms requests future evaluations
23            of Mr. Elias (inaudible) Board request
24            the evaluators conduct a thorough review
25            with Elias of his gang involvement."
```

1      Okay.  So, on that, we're going to go ahead and
2   open it up to any subsequent questions.  Commissioner,
3   do you have any?

4      **DEPUTY COMMISSIONER STAR:**  Well, piggy backing
5   something in that DA's letter, I went back and I looked
6   at the 2002 psych evaluation by Dr. Ruiz, and at that
7   time you told the doctor -- and I'm looking at Page 5
8   of his report, that you deny knowing that the victim
9   was associated with a gang in the area.  Now, that was
10  in 2002.  Do you recall that?

11     **INMATE ELIAS:**  I recall that.

12     **DEPUTY COMMISSIONER STAR:**  Okay.  Have you had
13  something that has happened since 2002, because it
14  appears in 2005, the issue of possible rape of your
15  girlfriend and then the gang issue seems to be clearer
16  in 2005, and before that, there's no record of it.  Did
17  something happen in between there that would explain
18  why those two factors came out in 2005 but not in 2002?

19     **INMATE ELIAS:**  2002, I did not want to talk
20  about it.

21     **DEPUTY COMMISSIONER STAR:**  Uh-huh.  Did you
22  deny to the doctor back in 2002 that you did not know
23  that he was gang?

24     **INMATE ELIAS:**  I don't remember actually
25  telling him --

1          **ATTORNEY STRINGER:**  If I could inquire, the
2     victim.

3          **DEPUTY COMMISSIONER STAR:**  What he wrote, Page
4     5 --

5          **ATTORNEY STRINGER:**  I don't think the victim
6     was a gang member, was he?  I don't even think
7     Mr. Elias even knew the victim.  I think he testified
8     to that.

9          **DEPUTY COMMISSIONER STAR:**  Yes.  It's stated
10    that Mr. Elias denies knowing that the victim had died
11    as a result of being shot until the next day and also
12    denies knowing that the victim was associated with a
13    gang in the area.  What I heard Mr. Elias say is that
14    he was in there territory and shot in that direction
15    because he thought the presence of him in that
16    territory, he would be gang associated?  This seems to
17    infer like you didn't even think about it, that he was
18    associated with a gang in the area.  Your earlier
19    statement was to me is you knew this to be a Border
20    Brother's area, and that's why you went there.

21         **INMATE ELIAS:**  Yeah.  I knew it to be a Border
22    Brother area, but I did not know for certain that this
23    individual was actually a Border Brother.

24         **PRESIDING COMMISSIONER ENG:**  Were you just
25    assuming?

1          **INMATE ELIAS:**  Yeah.

2          **PRESIDING COMMISSIONER ENG:**  That anybody that

3     you saw out there in that neighborhood was considered

4     the enemy?

5          **INMATE ELIAS:**  Yes.

6          **DEPUTY COMMISSIONER STAR:**  Did you ever learn

7     subsequently whether the 14-year-old who died here was

8     in the Border Brothers?

9          **INMATE ELIAS:**  No.

10          **PRESIDING COMMISSIONER ENG:**  You never learned

11    it either way yes or no either way?

12          **INMATE ELIAS:**  No.

13          **PRESIDING COMMISSIONER ENG:**  Why were you so

14    adamantly denying your gang affiliation and gang

15    involvement, anything to do with it?  Why?

16          **INMATE ELIAS:**  For many reasons because I

17    didn't want my family to know about it because they

18    never knew anything about it.

19          **PRESIDING COMMISSIONER ENG:**  You did not want

20    your family to know that you were in a gang?

21          **INMATE ELIAS:**  Yes.

22          **PRESIDING COMMISSIONER ENG:**  Is there any truth

23    that this person was shot in front of your house?

24          **INMATE ELIAS:**  Yeah.  But that had nothing to

25    do with gangs.  The thing was that my family --

82

1          **PRESIDING COMMISSIONER ENG:**  Were you the

2     target, sir?  Were you the target of that person but

3     they hit the wrong person?

4          **INMATE ELIAS:**  I don't know.

5          **PRESIDING COMMISSIONER ENG:**  I'm going to ask

6     you, are you not being forthcoming with this Panel?

7     Are you afraid of something?  Are you afraid of that?

8     Are you being truthful with us?

9          **INMATE ELIAS:**  I'm being truthful with you.

10          **PRESIDING COMMISSIONER ENG:**  You had no idea

11     whether or not -- why this person got shot in front of

12     your house?

13          **ATTORNEY STRINGER:**  Well, that's the trouble

14     with these DA letters.  They don't ever have any

15     substantiate to them.  They just shoot these wild

16     accusations.

17          **PRESIDING COMMISSIONER ENG:**  But they also have

18     privy to a lot more information than we do.  And,

19     however, apparently, these were in the previous

20     hearings so that's why I'm giving Mr. Elias ample

21     opportunity to respond because what we see here is why,

22     you know, back in these years, that you were in denial

23     about a lot of different, issues, and all of a sudden,

24     it's like a light switch went on and then you're

25     gradually coming clean.  But I got to be honest with

83

1   you, I see an awful lot of hesitation in your body

2   language today, and I wasn't sure if it's nerves.  I

3   was not sure what it was or if that's just your way.

4   So I want to give you ample opportunity to talk with

5   the Panel.

6        **INMATE ELIAS:**  I am talking with you, and I'm

7   letting you know why I didn't admit to any gang

8   involvement.

9        **PRESIDING COMMISSIONER ENG:**  Okay.

10       **INMATE ELIAS:**  For that reason and for another

11  reason because it's something that's always going to be

12  held against me for the rest of my life.  I never

13  wanted to admit to you guys, to the Panel, or to

14  anybody else that I had anything to do with gangs.

15       **PRESIDING COMMISSIONER ENG:**  Because you feared

16  that it was going to be held against you?

17       **INMATE ELIAS:**  Yeah.  I feel that it's going to

18  be held against me every time I come before you or just

19  in general.

20       **PRESIDING COMMISSIONER ENG:**  So that's why

21  you've been denying it?

22       **INMATE ELIAS:**  Yes.

23       **PRESIDING COMMISSIONER ENG:**  Have people on the

24  inside told you that?

25       **INMATE ELIAS:**  People on the inside, what do

1    you mean?

2         **PRESIDING COMMISSIONER ENG:**  On the inside of

3    prison.  Face facts, you've got a lot of gang members

4    inside.  Okay.  Prior gang -- you know, before being

5    incarcerated, there were gang members.  You also have a

6    lot of prison gangs.  Have people inside the

7    institution told you to deny it?

8         **INMATE ELIAS:**  No.

9         **PRESIDING COMMISSIONER ENG:**  So where did you

10   get the notion that Panels and everyone was going to

11   hold that against you for the rest of your life?

12        **INMATE ELIAS:**  Because I understand what it is

13   about gangs.  I understand that gangs are really

14   frowned upon and I knew that my involvement in a street

15   gang was frowned upon, and that's why --

16        **PRESIDING COMMISSIONER ENG:**  Killing people

17   also is frowned upon, right?  If you're upfront and

18   honest about what it was, you know, what was this gang?

19   What was that group of guys and what you were doing and

20   what your thought process was back when you were a kid

21   like that, it's still in your left interest, instead of

22   withholding information, it causes people to wonder

23   what's he hiding.  Does that make sense to you?

24        **INMATE ELIAS:**  I understand what you're saying.

25        **PRESIDING COMMISSIONER ENG:**  Okay.  Because --

1    and again, going back to your initial hearing, it

2    should have been brought out then that every Panel says

3    that it's in your best interest to be up front and

4    honest about things because it can make it more

5    difficult for you to overcome any misstatements or

6    withholdings.  Okay.

7            **INMATE ELIAS:**  And that's what I said at that

8    time.  Like I said in my initial, I just didn't want to

9    talk about anything.

10           **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.

11           **DEPUTY COMMISSIONER STAR:**  Did the person that

12   died, was he wearing a hat?  Do you remember?

13           **INMATE ELIAS:**  No.

14           **DEPUTY COMMISSIONER STAR:**  Was there any

15   clothing, colors or tattoos or anything on this person?

16           **INMATE ELIAS:**  Not that I remember.  It was

17   dark because it was at nighttime when it happened.

18           **DEPUTY COMMISSIONER STAR:**  Have you ever been

19   shot at or targeted by Border Brothers or affiliated

20   gangs as to your knowledge?

21           **INMATE ELIAS:**  No, not to my knowledge.  I

22   mean, not that I probably remember.  I mean, I've had

23   problems with them, yes.  That's why we're two

24   different gangs.

25           **DEPUTY COMMISSIONER STAR:**  Do you know this

1    Toby, the one that the DA's referring to?  Toby Rego,

2    R-E-G-O, do you know him?

3              **INMATE ELIAS:**  Yes.

4              **DEPUTY COMMISSIONER STAR:**  Was he visiting at

5    your house that day that he was shot?

6              **INMATE ELIAS:**  Yes.

7              **DEPUTY COMMISSIONER STAR:**  So he's visiting

8    your house and he gets shot in front of your house, but

9    you don't know why?

10             **PRESIDING COMMISSIONER ENG:**  Was he in the --

11             **ATTORNEY STRINGER:**  Is there any evidence

12   before the Panel that my client is a documented gang

13   member other than the DA just throwing around these

14   accusations?  I don't see anything in the file.

15             **PRESIDING COMMISSIONER ENG:**  We're talking

16   about an incident --

17             **ATTORNEY STRINGER:**  But you're trying to

18   infer -- I know where this is going -- you're trying to

19   infer that he's got some deep involvement in gangs and

20   there's nothing -- because when he starts throwing

21   around these terms like gang member and Border Brothers

22   and this Fruit Vale Gang and the rest of it.

23             **PRESIDING COMMISSIONER ENG:**  But, sir, that is

24   all in the documents here.

25             **ATTORNEY STRINGER:**  But those are specific

1   terms in the gang world.  Now, has he been documented

2   by the Police Department because you have to go through

3   a process?

4       **PRESIDING COMMISSIONER ENG:**  All I know is that

5   that's what I read into the record.  That's in the

6   probation officer's report?

7       **ATTORNEY STRINGER:**  Well, he could be a

8   wanna-be for all I know.  I mean --

9       **PRESIDING COMMISSIONER ENG:**  That's why we're

10  talking with him and asking him.  Okay.  And you're

11  client admitted that he was, yes, a Fruit Vale

12  Gangster, the FVG.

13      **ATTORNEY STRINGER:**  That's not exactly Neustra

14  Familia.

15      **PRESIDING COMMISSIONER ENG:**  I don't know the

16  difference.

17      **ATTORNEY STRINGER:**  Well, I do.

18      **PRESIDING COMMISSIONER ENG:**  That's why that

19  we're asking your client these questions.  Okay.  So

20  you did that on purpose to throw me off.

21      **DEPUTY COMMISSIONER STAR:**  Well, they are

22  street gangs that are affiliated with the

23  northern-southern ongoing battles.  I mean, that's

24  readable in the newspapers.

25      **ATTORNEY STRINGER:**  Well, that's true.  If

1    you're in here.  If you're in the prison system, you're

2    either a northern or southern.  They automatically

3    classify you, CDC does.  You didn't get away from that.

4         **PRESIDING COMMISSIONER ENG:**  Are you

5    classified?

6         **INMATE ELIAS:**  What do you mean am I

7    classified?

8         **ATTORNEY STRINGER:**  Well, you're either a

9    northern or a southern for CDC purposes.

10        **INMATE ELIAS:**  I'm a northern.

11        **PRESIDING COMMISSIONER ENG:**  You're in the

12   northern?

13        **ATTORNEY STRINGER:**  It doesn't make any

14   difference, if you're Hispanic.

15        **PRESIDING COMMISSIONER ENG:**  If you're

16   Hispanic, you're automatically classified.

17        **ATTORNEY STRINGER:**  Yeah.

18        **PRESIDING COMMISSIONER ENG:**  Okay.

19        **ATTORNEY STRINGER:**  That's, you know, nobody's

20   ever challenged that.

21        **DEPUTY COMMISSIONER STAR:**  I want to -- so this

22   guy who is visiting you leaves your house and gets

23   shot.  And you're telling Miss Eng that you did not

24   want to tell your parents about your gang involvement

25   but somebody leaving your house gets shot, what did you

1    tell your parents about this guy?  Did you tell them
2    you knew them or, you know, why he was shot?  I mean,
3    weren't they kind of concerned?
4           **INMATE ELIAS:**  Yeah, they were concerned, but
5    they don't know my part in the gang involvement.  They
6    don't know the type of stuff that I was involved in.
7           **DEPUTY COMMISSIONER STAR:**  You disagree with
8    this DA's letter that says that when Toby was shot it
9    was targeting, they were targeting you instead.  Do you
10   disagree with that?
11          **INMATE ELIAS:**  I don't know who they were
12   targeting.
13          **PRESIDING COMMISSIONER ENG:**  Did Toby hang out
14   with you a lot?
15          **INMATE ELIAS:**  Yeah, sometimes.
16          **PRESIDING COMMISSIONER ENG:**  Did he hang out
17   with the other two fellows too?
18          **INMATE ELIAS:**  A lot of people hung out.
19          **PRESIDING COMMISSIONER ENG:**  In the neighbor
20   or --
21          **INMATE ELIAS:**  Yeah, it's all in the
22   neighborhood.
23          **PRESIDING COMMISSIONER ENG:**  Okay.  I had asked
24   you earlier, okay, if you had ever shot anyone, didn't
25   I?

1           **INMATE ELIAS:** I never shot anyone.

2           **PRESIDING COMMISSIONER ENG:** Yeah, did you ever

3    shoot anyone?

4           **INMATE ELIAS:** No, I didn't.

5           **PRESIDING COMMISSIONER ENG:** Okay.  Okay.  I

6    don't have any other questions.  Do you?

7           **DEPUTY COMMISSIONER STAR:** No, I don't have

8    any.

9           **PRESIDING COMMISSIONER ENG:** Okay.

10   Mr. Stringer, do you have any follow-up questions?

11          **ATTORNEY STRINGER:** Yes, thank you,

12   Commissioner.  Mr. Elias, if the Board was to grant you

13   a date and they imposed a number of conditions upon you

14   and since we've discussed it such as you have no

15   association or involvement with any known gang members,

16   would you comply with each and every one of those

17   conditions?

18          **INMATE ELIAS:** Yes, I would.

19          **ATTORNEY STRINGER:** And you have no juvenile

20   record; is that right?

21          **INMATE ELIAS:** No.

22          **ATTORNEY STRINGER:** And no adult record?

23          **INMATE ELIAS:** No.

24          **ATTORNEY STRINGER:** So you've had no law

25   enforcement at all.

1          **INMATE ELIAS:**  No.

2          **ATTORNEY STRINGER:**  You've never had a

3     policeman come to you and say, 'Mr. Elias, we believe

4     you're in a gang, and we're going to ask you a number

5     of questions'?

6          **INMATE ELIAS:**  No.

7          **ATTORNEY STRINGER:**  Okay.  You've taken, as

8     you've testified to at this hearing, courses regarding

9     dry-cleaning.

10          **INMATE ELIAS:**  Yes.

11          **ATTORNEY STRINGER:**  Are you sufficiently

12     skilled that you could obtain a job in a dry-cleaning

13     business?

14          **INMATE ELIAS:**  Yes.

15          **ATTORNEY STRINGER:**  And that would be cleaning

16     all different types of clothes?

17          **INMATE ELIAS:**  Yes.

18          **ATTORNEY STRINGER:**  And how about welding, did

19     you, say, progress to spot welding or arc welding?

20          **INMATE ELIAS:**  Not necessarily.  I didn't get

21     too good.  I was not too good at it.

22          **ATTORNEY STRINGER:**  Do you know the basics?

23          **INMATE ELIAS:**  I know the basics.

24          **ATTORNEY STRINGER:**  And as to the other job

25     offers, Webber's Meats and at the Mexican restaurant

1   and the rest of it, you realize that those would

2   probably be entry-level positions?

3          **INMATE ELIAS:**  Yeah.

4          **ATTORNEY STRINGER:**  And that does not bother

5   you at all?

6          **INMATE ELIAS:**  No.

7          **ATTORNEY STRINGER:**  And you said you liked to

8   draw.  What type of pictures do you like to draw?  Is

9   this pencil?  Pen and ink?  What is it?

10         **INMATE ELIAS:**  Mostly I just draw with a

11  pencil, pencil and pen.

12         **ATTORNEY STRINGER:**  And is this something that

13  you're trying to draw out of your self, explore, and

14  get better at it?

15         **INMATE ELIAS:**  Yes.

16         **ATTORNEY STRINGER:**  Something that interests

17  you?

18         **INMATE ELIAS:**  Something that interests me.

19         **ATTORNEY STRINGER:**  And you've also had no

20  115's while you've been incarcerated; is that right?

21         **INMATE ELIAS:**  Yes.

22         **ATTORNEY STRINGER:**  And no one in CDC as ever

23  classified you as a specific, and I mean that term

24  directly, as a specific gang member; is that right?

25         **INMATE ELIAS:**  No.

1          **ATTORNEY STRINGER:** And there are Border

2     Brothers in the institutions, of course?

3          **INMATE ELIAS:** Yes. I know them.

4          **ATTORNEY STRINGER:** Okay. Thank you. Thank

5     you, Commissioner.

6          **PRESIDING COMMISSIONER ENG:** Okay. Let's go

7     into final statements. Go ahead, Mr. Stringer.

8          **ATTORNEY STRINGER:** Mr. Elias came into the

9     institution at a very young age, and I think that

10    certainly is worth noting. Obviously, the crime he and

11    his crime partner committed was a very, very senseless

12    act, a young boy gunned down before he ever had an

13    opportunity to really live his life by another young

14    man that got caught up in whatever neighborhood

15    organizations he decided he wanted to belong to. But

16    to say that he was a hard core gang member, as I would

17    interpret it from the LA area, for instance, or even

18    from the Bay Area, I think is incorrect. I think he's

19    someone that just got caught up in that life style and

20    has now realized what it was, what it has meant to him

21    and certainly what it has meant to the victim's family

22    and doesn't want anything to do with it anymore. If he

23    had any of these affiliations that's been suggested by

24    the District Attorney or the rest of it, it would

25    appear somewhere in his record. And, of course, it

1    does not. He has no juvenile record. He has no adult

2    record, so he's never had any contact with law

3    enforcement at all. So how could they determine that

4    he was -- had membership in this Fruit Vale Gang. I

5    don't know how they would have done that, and I would

6    have like to have seen the District Attorney support

7    his contentions with some documents, at least, from the

8    Police Department or the gang task force. But, within

9    the institutions, he has progressed. He hasn't shown

10   any violent tendencies at all. He has not had any

11   115's during his entire stay, which is, of course,

12   remarkable in it self. He has attempted to upgrade

13   himself vocationally and educationally, achieving

14   vocational skills in dry-cleaning, and, of course, he

15   has some basic level experience in welding. He's also

16   attended Overcomers and is attempting to take some

17   college courses and is just now developing, which may

18   be a skill in drawing. The people that have evaluated

19   him have indicated that he has done well within the

20   institutions, although this is a May 23rd, '05 chrono

21   by Collette Carol, who is a program coordinator for

22   project IMPACT, I think it's worth placing into the

23   record and it says:

24          "Mr. Elias completed 78 hours of

25          intensive training to become a facilitate

1             or for Project IMPACT and that's
2             Incarcerated Men Putting Away Childish
3             Things Program.  Mr. Elias was selected
4             to complete this training based upon his
5             exemplary behavior and attitude, for the
6             positive example that he portrays to
7             others.  The training sessions included
8             multiple workshops which focused on
9             improving public speaking skills,
10            critiquing other facilitator's
11            presentations and developing a better
12            understanding of what Project IMPACT
13            represents in both the outside community
14            and within the prison community.  Inmate
15            Elias is commended for his willingness
16            and commitment to helping people through
17            the facilitation of Project IMPACT's
18            program as encouraging and continuing to
19            be an example."
20        He also has two chronos, one in September 30th,
21        2006 from Overcomers outreach, which is a 12-step
22        recovery program related to the 12 steps of AA and the
23        Holy Bible.  It says:
24            "In our weekly meetings, we work through
25            a work book called the 12 steps, a

```
1           spiritual journey.  Our discussions of
2           self exception, acknowledgment of
3           character defects, restitution for harm
4           done and working with others has been
5           beneficial in applying a life of recovery
6           for him.  He should be commended for his
7           faithfulness in attendance of this open
8           and honest sharing with the group."
```

9           I think that those chronos are borne out by
10   what Dr. Starrett indicated in his recent psychological
11   evaluation.  In talking with my client about the life
12   crime on Page 4, it indicates that my client told the
13   doctor concerning this, the victim in the case and the
14   fact that he was responsible for his death, says:  "It
15   hurts me that I took someone's life.  He never had a
16   chance to grow up and have a family or children."  It
17   says, when he asked the inmate how you make restitution
18   for something like this, the inmate states, "You can't.
19   No matter how much time I do, it won't pay for a life."
20   And I think that shows some real insight into the
21   impact that this has caused to the community and to
22   this youngster's family.  In rating his assessment of
23   dangerousness, the doctor uses the three psychopathy
24   tools that have been documented here at the Board, but
25   ends with saying, the inmate's overall propensity for

1    future violence is in the low range. Certainly, that
2    assessment is supported by the fact that my client has
3    had no is 115's since coming into the institution.  In
4    the Board report of May 2005, several therapy and
5    self-help activities are documented from 1994 when he
6    received his GED through 2003, where he has
7    certificates of various dry-cleaning skills through
8    2005, in which he participated in IMPACT 16-week
9    workshop on addiction. His participation in the
10   self-help and therapy activities covers almost a page
11   and a half, so he certainly has put his time within the
12   prison system to good use. He does have several
13   opportunities for a residence and also several
14   opportunities for employment that the parole department
15   can investigate and verify upon his release. He's been
16   forthright and honest with the Board. He knows the
17   gravity of his offense. He has the appropriate remorse
18   for the death of this youngster and has shown insight
19   into how he came to be in the prison system. I would
20   ask that because of Mr. Elias's exemplary behavior with
21   the prison system, he be considered for parole.  Thank
22   you.

23        **PRESIDING COMMISSIONER ENG:**  Mr. Elias, would
24   you like to make a final statement, or would you like
25   to rest with what Mr. Stringer has made in his final

1   statement?

2        **INMATE ELIAS:** I just want to make a quick
3   statement.

4        **PRESIDING COMMISSIONER ENG:** Go ahead.

5        **INMATE ELIAS:** As he was saying, I'm
6   (inaudible) for what I did, whether you guys believe me
7   or not with the gangs. I told you everything that was
8   my part in gang involvement. Am I part of the gang
9   now? No, I'm not. Do I associate with any gang
10  members or people from that gang? No, I do not. That
11  day when I pulled that trigger, I was a kid. I didn't
12  really understand what I was doing. That's it. I
13  didn't think about the consequences beyond my actions.
14  I didn't think about all the people that were going to
15  get hurt in the process by me pulling that trigger. I
16  think about his family. I think everything that he
17  would be missing. Just because I didn't think about me
18  actually killing somebody. I didn't think that if I
19  pulled that trigger he's going to die. Yes, I
20  understand that a gun, in shooting a gun could that
21  potentially kill somebody, but at that time, it didn't
22  process in my mind because I was (inaudible)
23  consequences. There's nothing I can say or do that's
24  going to change that day. I made a mistake. I made a
25  terrible mistake and took someone's life, and I'm

1   really sorry for it.  And every day, it's something I
2   got to live with for the rest of my life.  Thank you.
3   I mean, even knowing that my daughter, what she's going
4   through.  For her I need to apologize for my mistake.
5   I want you to know that the kid that pulled that
6   trigger, that's not me anymore.  And I know I can't
7   make it right, nothing I can do can make it right.  I
8   mean, whether you find me suitable for not, just know
9   that I will continue to do what I'm doing and be the
10  best person that I can do, doing the best that I can.
11  But even if I was, I would have made the choices that I
12  made then as a kid, that kid -- that kid's not here
13  anymore.  I do not (inaudible) gangs.  I want to do
14  everything right and do everything that I can, but I
15  know everything begins with me.  I took, now I just
16  want to do everything I can to give back to my family,
17  to my community, and everything.  I'm sitting on
18  something that I'm going to have to live with for the
19  rest of my life, whether I'm in here, whether I'm out
20  there, I'm never going to forget this.  It changed many
21  people's lives.  It never gave him a chance.  He was a
22  youngster, just as I was.  Truly, I'm sorry for what I
23  did.

24          **PRESIDING COMMISSIONER ENG:**  Are you all right?
25  Are you okay?

100

1          **INMATE ELIAS:**  Yeah.

2          **DEPUTY COMMISSIONER STAR:**  Anything else, sir,

3     that you wanted to say?

4          **INMATE ELIAS:**  No.   That's it.

5          **DEPUTY COMMISSIONER STAR:**  Thank you.

6          **PRESIDING COMMISSIONER ENG:**  We'll  know  recess

7     for the deliberations.   The time is 8:00.

8                    **R E C E S S**

9                     --oOo--

10

11

101

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N.**

3           **PRESIDING COMMISSIONER ENG:**  Okay.  The time is

4       8:36.  All parties that were present prior to our

5       recess for deliberations have since returned.  Before I

6       go into the reading of the decision, Mr. Stringer did

7       raise some something that we really need to put into

8       the record because earlier today, we had spend well

9       over an hour, I believe, trying to figure out whether

10      or not we had jurisdiction and if she should be even

11      going forward with this subsequent hearing, and what

12      alarmed all members of Panel was taking a look, we

13      couldn't understand how this inmate was received into

14      CDC in 1997 on a 16 to life Murder 2 sentence and

15      basically has been in CDC for ten years, and this was

16      his second subsequent hearing, that he had his initial

17      hearing in 2002.  It appeared to this Panel, all the

18      Panel members, to have been approximately five years

19      after he had been received into CDC.  And we thought

20      something isn't right here, based on the number that we

21      had.  So, because -- it just doesn't make any sense

22      because basically Commissioner Star, what did you say,

23      that generally they'll get -- what percentage?  You go

24      ahead.

25      **OSVALDO ELIAS   K-50464   DECISION PAGE 1   08/07/2007**

1    **DEPUTY COMMISSIONER STAR:** Yeah, let me.  The
2    issue of concern to the Board was whether the minimum
3    eligible parole date was accurately calculated given
4    that his life term had started on, according to your
5    records, the life term stated on May 12th, 1997, and
6    with a 16 to life, life term, that would have made the
7    minimum eligible time period, two thirds of that term
8    would have been ten years, which would have made his
9    initial about now, and instead we were all scheduled
10   and he had already had an initial and a subsequent one,
11   and we're on subsequent number two.  So we contacted --
12   the Board contacted Vern Jones here an San Quentin
13   records as well as Delores Paschal, P-A-S-C-H-A-L, case
14   records administer with the legal processing unit and
15   confirmed to both of them that he was -- he had
16   court-approved credits, pre-sentencing credits for time
17   in jail that was both taken off the one-year
18   determinant sentence he got for the weapon as well as
19   taken off the calculation of the minimum eligible
20   parole date calculation.  And since it was sizable,
21   without giving an exact number today, which say
22   record's calculations, they were sizable amounts,
23   that's what resulted in the 2003 minimum eligible
24   parole date.  And, so, after we confirmed it with both
25   **OSVALDO ELIAS    K-50464    DECISION PAGE 2    08/07/2007**

1   those, we went ahead and proceeded.

2         **PRESIDING COMMISSIONER ENG:**  That's right.  So,

3   Mr. Elias has been back and forth because we were

4   trying to figure this out.  Okay.  Thank you.  So, on

5   that note, the Panel has received all information

6   received from the public and relied on the following

7   circumstances in concluding that the prisoner is not

8   suitable for parole and would pose an unreasonable risk

9   of danger to society or a threat to public safety if

10   released from prison.  One of the main factors that the

11   Panel did consider really goes back to the commitment

12   offense, that we found that it was carried out in a

13   very cruel and callous manner.  This young 14-year-old

14   boy was just standing there on the street corner in his

15   own neighborhood when Mr. Elias, along with his two

16   crime partners, deliberately, and this was very

17   calculated, deliberately drove into that area looking

18   for anyone there to hurt, thinking that anyone who

19   lived in that area could have had something to do with

20   a rival gang and they basically, two of them, went in

21   armed, along with the driver of the vehicle, and

22   apparently, when they pulled up and saw this person

23   standing there Mr. Elias decided to shoot his weapon

24   and then taking a life of a 14-year-old.  It really was

25   **OSVALDO ELIAS   K-50464   DECISION PAGE 3   08/07/2007**

1    carried out in a manner that shows total disregard for
2    human suffering and life.  Didn't even wait around to
3    see if this person was dead or alive, and the only way
4    he found out that anything had happened was by somebody
5    showing him the picture the next day.  The motive for
6    the crime, really, had to do with gang retaliation.
7    And, again, this is all based on the documentation that
8    we have and also based on what the prisoner has stated
9    to us.  It was very trivial in that it was really a
10   random shooting of someone.  And these conclusions are
11   drawn from the statement of facts whereon that day back
12   on October 3rd, 1996, officer found a 14-year-old
13   teenager, Adolpho Espinoza on the ground suffering from
14   three gunshot wounds.  He was transported to the
15   hospital where he died the next day.  It appears that
16   he was standing on the corner when a large,
17   dark-colored sedan drove by where the occupants
18   shooting at the victim.  The following investigation
19   pointed to three young men being involved in offense,
20   Cesar Estrada is alleged to have been the driver the
21   car, which contained Jose Cervantes and Osvaldo Elias.
22   It was Cervantes and Elias who were alleged to have
23   fired their separate guns at the victim.  Regarding
24   prior record, we do note that before this life crime
25   **OSVALDO ELIAS    K-50464    DECISION PAGE 4    08/07/2007**

1    occurred, Mr. Elias was a juvenile, was only 16 years
2    of age, and we didn't see any other contacts with law
3    enforcement prior to this life offense.  We do note
4    that he does have an unstable social history, however,
5    and this being his gang affiliation since he was 13
6    years of age.  Excuse me.  And also the fact that he
7    was a drop out in school and living at home at this
8    time.  And wasn't working, was getting more involved in
9    the gang, had gotten his young girlfriend pregnant when
10   she was approximately 15, so was basically a father
11   when he was around 16 years of age when this life crime
12   occurred.  And basically, he was living with his
13   girlfriend and his baby with no viable means of
14   support.  Institutional behavior, we find that the
15   prisoner has not sufficiently participated in
16   beneficial self-help and that his misconduct includes
17   one 128 counseling chrono that he incurred in April of
18   2006 for disrespect towards staff.  The psychological
19   portion, we're going to go back and take a look and
20   basically quote from the two prior ones that were very
21   close in time, one in April of 2005 by Dr. Kornberg,
22   K-O-R-N-B-E-R-G, and the most recent one of April 2007,
23   authored by Dr. Starrett, S-T-A-R-R-E-T-T, are not
24   totally supportive of release in that the most current
25   **OSVALDO ELIAS    K-50464    DECISION PAGE 5    08/07/2007**

1    one, Dr. Starrett states under the assessment of

2    dangerousness and looks at the clinical insight, but he

3    does state that the inmate would rate low on the other

4    factors, but he also states the inmate has begun to

5    program beginning in the early 2000's and needs to

6    continue along this path.  The inmate understands many

7    of the factors on the surface that contributed to his

8    crime, a little more in-depth into the underlying

9    issues and how he has dealt with them would be

10   appropriate.  And then in the April 2005 report,

11   significant risk factors, precursors to violence,

12   Dr. Kornberg states that: "Mr. Elias's prior history of

13   violence placed him at a greater risk for future

14   violence than a person with no such history.  The lack

15   of a relationship between Mr. Elias and the victim

16   suggests a random nature to his violent act which may

17   also increase risk of dangerousness."  Regarding

18   parole plans, it was very, very clear that Mr. Elias

19   does have very strong and somewhat widespread family

20   support.  However, the documentation provided to the

21   Panel did lack specificity, particularly with

22   employment.  We had a little discussion about what he

23   may want to do in terms of really firming up the parole

24   plans and maybe prioritizing them and to get down to

25   **OSVALDO ELIAS   K-50464   DECISION PAGE 6   08/07/2007**

1    what -- what are the plans that you really want to put
2    into place and cut out all the other stuff that does
3    not make sense and just focus on the ones that make the
4    most sense and that will enable the prisoner to be more
5    successful and with that being Stockton or anywhere
6    else, then that's where he should focus because Panels
7    do is the ability to parole to counties other than the
8    county of commitment where they lived, especially if
9    it's in the best interest of the prisoner for success.

10          **DEPUTY COMMISSIONER STAR:** And I'd want to add
11   that, in your case, sir, I think with a little more
12   in-depth understanding of your gang, the gang nature of
13   this crime, you would understand that probably
14   returning to Oakland, given that there are still
15   northern southern problems going on and still Border
16   Brother issues that are still very current that you
17   could easily present to the Board another plan that
18   would be more attractive to go to another area since
19   that is still a current problem, and your crime and the
20   reason you're here is connected to that.

21          **PRESIDING COMMISSIONER ENG:** So, you don't have
22   to do any of this, but it would be in your best
23   interest to really, seriously take a look at alternate
24   areas to get far away from any possibilities of any
25   **OSVALDO ELIAS    K-50464    DECISION PAGE 7    08/07/2007**

1    type of gang involvement, whether it was intended or
2    not, even if they come after you. So just something to
3    think about. And I just want to adhere, sir, we see
4    more current gang members all the time. So, you know,
5    we're not that naive about the situation. Regarding
6    3042 responses, the Panel does note that we were in the
7    receipt of a letter from the District Attorney of
8    Alameda County, and they did state their opposition to
9    parole at this time. The Panel makes the following
10   findings, that prisoner does need documented self-help
11   in order to face, discuss, understand, and cope with
12   stress and anger in a non-destructive manner. Until
13   progress is made, the prisoner continues to be
14   unpredictable and a threat to others. We find that the
15   prisoner's gains regarding the role of gang involvement
16   with the instant offense has been recent, at least
17   since, I believe it was 2005, and he must be able to
18   demonstrate an ability to maintain gains over an
19   extended period of time, and we felt that you still
20   have a ways to go. However, the prisoner should be
21   commended for a few things. Number one, getting his
22   GED.  He dropped out of school when he was 13 years
23   old.  He was just hanging around and being in the
24   streets and hanging out with the gangs; and, yet, he
25   **OSVALDO ELIAS   K-50464   DECISION PAGE 8   08/07/2007**

1    was able to get his GED in 1994. And also for his

2    continuing education in taking some college-level

3    courses, the fact that he was able to obtain his

4    vocation in dry-cleaning and also the fact that he

5    doesn't have any serious 115 disciplinaries. However,

6    these positive aspects of his behavior do not outweigh

7    the factors of unsuitability. This is a three-year

8    denial. In a separate decision, the hearing Panel

9    finds that the prisoner has been convicted of murder,

10   and it is not reasonable to expect that parole will be

11   granted at a hearing during the next three years. The

12   prisoner -- specific reasons for this finding are as

13   follows, the prisoner did commit the offense in a very

14   cruel manner, specifically, he made the choice to arm

15   himself with a loaded weapon, get in that car, and go

16   ahead and go along with the driver and his other crime

17   partner. He also made the choice to shoot that weapon,

18   ended up taking at life of a 14-year-old kid and then

19   took off, and then basically, I believe he was at large

20   for close to a year. It was carried out in a very

21   calculated manner, when, again, these three FVG

22   affiliated gang members decided to go into that area

23   where these rival gang people lived and specifically

24   wanted to hurt somebody all to get even. It was gang

25   **OSVALDO ELIAS   K-50464   DECISION PAGE 9   08/07/2007**

1    retribution on a lot of different levels, so it really
2    shows a total disregard for human life or human
3    suffering.  They didn't think in terms that somebody
4    could actually lose their life.  They were just going
5    to hurt somebody.  This prisoner does have a history of
6    unstable tumultuous relationships with others.  Again,
7    since he was 13 years of age being affiliated with a
8    gang, going around with a gun, and everything else that
9    we've put into the record earlier about dropping out of
10   school and being a very, very young father, all up
11   until the time that this commitment offense occurred.
12   Both of those psychological reports, the April '05 and
13   the April '07 indicate a need for a longer period of
14   observation and evaluation.  This prisoner has not
15   completed the programming necessary, that actually is
16   essential to his adjustment, and he needs additional
17   time to gaining this programming.  Sir, you've been
18   going to programs, I mean, on and off you've gone to
19   things like IMPACT and I believe Kairos.  I can't
20   remember exactly.

21           **DEPUTY COMMISSIONER STAR:** Overcomers.  It was
22   Overcomers.

23           **PRESIDING COMMISSIONER ENG:** Overcomers.  Okay.
24   It's very important that when somebody comes back to a
25   **OSVALDO ELIAS   K-50464   DECISION PAGE 10   08/07/2007**

1   Panel to be able to be very forthright with the Panel
2   and say, okay, I chose to go to this program because
3   this is what I thought I could use for my situation.
4   You know, whether that means to gain insight to help me
5   deal with some insecurities I might have, and then more
6   important, tell -- be able to tell us specifically what
7   you used.  What did you get out of it?  How do you
8   apply anything that you've learned?  Okay.  I will tell
9   you I was impressed with the way that you talked about
10  the Overcomers Outreach, and I believe, was that your
11  12-step -- does that have to do with the 12-step
12  program?

13         **INMATE ELIAS:**  Uh-huh.

14         **PRESIDING COMMISSIONER ENG:**  And how you
15  recognized that it really did make a difference if you
16  had a substance abuse problem.  And sometimes,
17  repeating some of these programs, all of a sudden,
18  different lights will go off.  But I can't help but
19  tell you that we had this feeling that we couldn't get
20  over that you were holding something back.  I don't
21  know if it was your intent or not.  It could have been
22  nerves.  It could have been anything, but when you go
23  back and you take a look at some of the former, the
24  prior decisions, there's something that's lurking
25  **OSVALDO ELIAS   K-50464   DECISION PAGE 11   08/07/2007**

1    that's just hanging out there. It's like the elephant
2    in the room that everybody wants to ignore. And we
3    tried to tell you that the best thing you can do is
4    just come out and say it. We've dealt with a lot --
5    like I said, a lot of former gang members that, you
6    know, obviously their crimes were gang-related and they
7    just come right out, and they say, well, you know, this
8    is where my head was at back then and just matter of
9    fact, and they talk about it, and then they get -- they
10   put it behind them. Couldn't help but get the feeling
11   that you're holding something back, and the more we got
12   feeling, the more red flags it puts up and the more
13   doubt, and we started to wonder, what's he hiding,
14   what's he not telling us. And, again, coupled with
15   some of the history that's -- that's in the
16   documentation, it raises a lot of questions. That's
17   something that I hope that will calm down about that if
18   you sit down and you read your prior transcripts, you
19   read this transcript, and try to get an understanding
20   of why you came across that way. Because, again, it
21   may not have been your intent, but that's the way it
22   was perceived, and you may want to really, seriously
23   think about well, how can I turn this around? You
24   know, what is it I need to do. And I forgot you had
25   **OSVALDO ELIAS   K-50464   DECISION PAGE 12   08/07/2007**

1    said something earlier. I was glad that you said in
2    your closing statement that no matter what happens
3    you're going to keep moving forward. Don't ever forget
4    that because you can make a difference. You can make
5    changes. Okay. And that's all up to you because just
6    like the choices you made, and we know they were really
7    bad ones back in your preteen or your teenage years.
8    You made horrible, horrible choices, something where
9    your responsibility, be with your decision. So you
10   need to make those decisions from here on in and decide
11   if you truly want to go and give back to society. If
12   it's hard for you to talk to Panel's about it, then be
13   able to come and show us. You can show about your
14   remorse, about your insight and your understanding
15   about what led through actions, and I hope that makes a
16   little sense to you. And, like I said, I hope that
17   when you calm down and you think about it, but that's
18   why we felt that more time is required before any Board
19   is going to find you suitable for parole. You need
20   time to figure this out and to get going and really
21   pull together and be able to come in and discuss these
22   things very openly and don't ignore the elephant in the
23   room because it doesn't work that way. It's only going
24   to work against you because it's going to raise doubts
25   **OSVALDO ELIAS    K-50464    DECISION PAGE 13    08/07/2007**

1    in people's minds and be able to talk about it.  So,

2    this Panel does recommend that you remain disciplinary

3    free.  You've done a great job with that.  And that, if

4    available, you continue to participate in self-help,

5    but, again, be able to talk about what did you get out

6    of it.  Even if it means you didn't get anything out of

7    it, say so, you know.  'I was hoping to get this out of

8    it, but you know what, I didn't, but I did get

9    something else out of it or it triggered something

10   else.'  So be able to talk about that.  And we ask that

11   you cooperate with clinicians in completing an updated

12   evaluation.  That basically concludes the reading of

13   the decision.  I'm going to ask my fellow Commissioner

14   if she has anything to add of if I've forgotten

15   anything.

16            **DEPUTY COMMISSIONER STAR:**  No, thank you.  I

17   appreciate it.  You covered everything.

18            **PRESIDING COMMISSIONER ENG:**  Okay.  Good luck,

19   sir.  The time is 8:56.

20                 **A D J O U R N M E N T**

21   **PAROLE DENIED THREE YEARS.**

22   **THIS DECISION WILL BE FINAL ON:**    **DEC 0 5 2007**

23   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

24   **DATE, THE DECISION IS MODIFIED.**

25   **OSVALDO ELIAS   K-50464   DECISION PAGE 14   08/07/2007**

115

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KERRY VIENS, a duly designated transcriber, do hereby declare and certify under penalty of perjury that I have transcribed one audio recording which covers a total of pages numbered 1 - 114, and which recording was duly recorded at SAN QUENTIN STATE PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of OSVALDO ELIAS, CDC Number K-50464, on August 7, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated September 18, 2007 at Sacramento, California.

*Kerry L. Viens*

KERRY VIENS, Transcriber
**Foothill Transcription Company, Inc.**

EXHIBIT          "B"

Court of Appeal, First Appellate District, Div. 2 - No. A120374
**S161257**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re OSVALDO ELIAS on Habeas Corpus

The petition for review is denied.

George, C.J., was absent and did not participate.

SUPREME COURT
**FILED**

APR **2 3** 2008

Frederick K. Ohlrich Clerk

———————————
Deputy

Acting Chief Justice

OSVALDO ELIAS K-50464
SAN QUENTIN STATE PRISON 3-N-21
SAN QUENTIN, CA 94974

UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483



02 1M
0004248283    MAY 29 200
MAILED FROM ZIP CODE 9496

$ 04.80

UNITED STATES POSTAGE
PITNEY BOWES